### STATE OF NORTH DAKOTA v. OLSON, Collector of Internal Revenue.

Circuit Court of Appeals, Eighth Circuit. June 24, 1929.

No. 8122.

John Thorpe, Asst. Atty. Gen. of North Dakota (George F. Shafer, Atty. Gen. of North Dakota, on the brief), for appellant.

Seth W. Richardson, U. S. Atty., of Fargo, N. D., for appellee.

Before LEWIS and PHILLIPS, Circuit Judges, and SANBORN, District Judge.

PHILLIPS, Circuit Judge. This is an action brought by the Bank of North Dakota against Gunder Olson, as collector of internal revenue for the district of North Dakota, to recover the sum of $6,085 assessed and collected from the Bank of North Dakota under the capital stock tax provision of the United States Revenue Acts of 1918 and 1921 (40 Stat. 1057, 42 Stat. 227).

From a decree in favor of the collector, the bank has appealed.

In 1918, the Constitution of North Dakota was amended by the adoption of article 32 of Amendments (see § 185), which reads as follows: "The state, any county or city, may make internal improvements and may engage in any industry, enterprise or business, not prohibited by Article 20 of the Constitution." Article 20 (§ 217) relates to the manufacture and sale of intoxicating liquors.

The Bank of North Dakota was created by chapter 147 of the Session Laws of North Dakota for 1919. Section 1 of that act reads as follows: "For the purpose of encouraging and promoting agriculture, commerce and industry, the State of North Dakota shall engage in the business of banking, and for that purpose shall, and does hereby, establish a system of banking owned, controlled and operated by it, under the name of the Bank of North Dakota."

Section 2 of such act provides that it shall be operated, managed, and controlled by the Industrial Commission. The Industrial Com-

mission was created by chapter 151 of the Session Laws of North Dakota for 1919, and is composed of the Governor, the Attorney General, and the Commissioner of Agriculture and Labor. Section 5 of chapter 151, supra, provides that the Commissioner is empowered to manage, operate, control, and govern all utilities, industries, enterprises, and business projects now or hereafter established, owned, undertaken, administered, or operated, by the state of North Dakota, except penal, charitable, and educational institutions.

Section 3 of chapter 147, supra, authorizes the Commission to acquire all requisite property and property rights for the bank.

Section 4 of chapter 147, supra, authorizes the Commission to employ a manager and necessary subordinate officers and employees.

Section 6 of chapter 147, supra, provides for the issuance by the state of $2,000,000 in bonds to provide the capital for the bank.

Section 7 of chapter 147, supra, provides that public funds shall be deposited in the bank.

Section 9 of chapter 147, supra, provides that the bank may receive deposits from any source.

Section 14 of chapter 147, supra, provides that the bank may deposit funds in any other bank or banking association.

Section 15 of chapter 147, supra, provides that the bank may make loans to political subdivisions of the state, to state and national banks and, when secured by first mortgages on real estate in the state of North Dakota, to private persons or corporations.

Section 22 of chapter 147, supra, provides that the bank may be sued on account of causes of action claimed to have arisen out of transactions connected with the operation of the bank.

Counsel for the bank rely upon two principal propositions:

First. That the bank is neither a corporation, an association, nor a joint-stock company, and therefore does not come within the purview of the capital stock tax provision of the federal revenue acts of 1918 and 1921.

Second. That the federal government has no power, under the Constitution of the United States, to levy a capital stock tax upon the Bank of North Dakota because such bank is a governmental agency of the state of North Dakota and exempt from federal taxation.

Taking up the first contention of counsel for the bank, we find that section 1000(a) of the Revenue Act of 1918 (40 Stat. 1126), in part, provides: "(1) Every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fair average value of its capital stock for the preceding year ending June 30 as is in excess of $5,000." And that section 1 of such act, in part, provides: "The term 'corporation' includes associations, joint-stock companies, and insurance companies."

These provisions were re-enacted by sections 1 and 1000(a) of the Revenue Act of 1921 (42 Stat. 227, 294).

In construing these provisions, in Hecht v. Malley, 265 U. S. 144, at page 154, 44 S. Ct. 462, 466 (68 L. Ed. 949), the Supreme Court said:

"Reading together the defining and enacting sections of the Act it is as if Sec. 1000(a) provided in terms that: Every corporation, association, joint-stock company and insurance company, 'created or organized in the United States,' shall pay a special excise tax as prescribed, with respect to the carrying on or doing business. And it must be given effect as thus read."

We are of the opinion that the broad language employed by Congress in the provisions of the act above quoted manifested an intent on the part of Congress to levy an excise tax on every kind of business association.

The Bank of North Dakota is an artificial being created by statute to engage in the banking business. It is endowed with certain powers and capable of subjecting itself to liabilities. It may sue and be sued. It has a capital stock owned by the state. It is managed by the Industrial Commission which corresponds to a board of directors. It possesses the attribute of a corporation sole and, unless exempt because it is an instrumentality of the state, is subject to the tax.

The second contention made by counsel for the bank presents a more difficult problem. The general principles which must be adhered to in determining whether the bank, as an instrumentality of the state, is exempt from federal taxation, were stated by the Supreme Court in Metcalf & Eddy v. Mitchell, 269 U. S. 514, at pages 522 and 523, 46 S. Ct. 172, 174 (70 L. Ed. 384), as follows:

"Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application. But this Court has repeatedly held that those agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other. * * *

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax * * * or the appropriate exercise of the functions of the government affected by it. * * *

"While it is evident that in one aspect the extent of the exemption must finally depend upon the effect of the tax upon the functions of the government alleged to be affected by it, still the nature of the governmental agencies or the mode of their constitution may not be disregarded in passing on the question of tax exemption; for it is obvious that an agency may be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government, that any taxation of it by the other would be, such a direct interference with the functions of government itself as to be plainly beyond the taxing power.

"It is on this principle that, as we have seen, any taxation by one government of the salary of an officer of the other, or the public securities of the other, or an agency created and controlled by the other, exclusively to enable it to perform a governmental function, * * * is prohibited."

Of the adjudicated cases, the one most nearly in point is South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737. In that case, the state of South Carolina, under the provisions of several statutes adopted by the state, had established dispensaries for the wholesale and retail sale of intoxicating liquor, and had prohibited the sale thereof by other than such dispensaries. The state was the principal, and the dispensaries acted as the agents of such principal in selling such liquor. The dispensaries had no interest in the sales and received no profits therefrom. The entire profits were appropriated by the state, one half being divided equally between the municipality and the county in which the dispensaries were located, and the other half paid into the state treasury. The state protested payment of certain internal revenue license taxes and brought three actions in the Court of Claims to recover the amounts paid. These actions were consolidated, judgment in the Court of Claims went in favor of the United States, and the case came before the Supreme Court of the United States on appeal.

The dispensaries were established by the state in the exercise of its police power to regulate the liquor traffic. The argument was made that if Congress could tax the agents of the state charged with the duty of selling intoxicating liquors, it could in effect assume control over the police power of the state to regulate the liquor traffic within its borders and could thus embarrass and thwart the attempt of the state to carry on its adopted mode of regulation. In disposing of this argument, the Supreme Court said:

"We are not insensible to the force of this argument, and appreciate the difficulties which it presents, but let us see to what it leads. Each State is subject only to the limitations prescribed by the Constitution and within its own territory is otherwise supreme. Its internal affairs are matters of its own discretion. The Constitution provides that 'the United States shall guarantee to every State in this Union a republican form of government.' Art. 4, § 4. That expresses the full limit of National control over the internal affairs of a State.

"The right of South Carolina to control the sale of liquor by the dispensary system has been sustained. Vance v. W. A. Vandercook Co., No. 1, 170 U. S. 438 [18 S. Ct. 674, 42 L. Ed. 1100]. The profits from the business in the year 1901, as appears from the findings of fact, were over half a million of dollars. Mingling the thought of profit with the necessity of regulation may induce the State to take possession, in like manner, of tobacco, oleomargarine, and all other objects of internal revenue tax. If one State finds it thus profitable other States may follow, and the whole body of internal revenue tax be thus stricken down.

"More than this. There is a large and growing movement in the country in favor of the acquisition and management by the public of what are termed public utilities, including not merely therein the supply of gas and water, but also the entire railroad system. Would the State by taking into possession these public utilities lose its republican form of government?

"We may go even a step further. There are some insisting that the State shall become the owner of all property and the manager of all business. Of course, this is an extreme view, but its advocates are earnestly contending that thereby the best interests of all citizens will be subserved. If this change should be made in any State, how much would that State contribute to the revenue of the Na-

tion? If this extreme action is not to be counted among the probabilities, consider the result of one much less so. Suppose a State assumes under its police power the control of all those matters subject to the internal revenue tax and also engages in the business of importing all foreign goods. The same argument which would exempt the sale by a State of liquor, tobacco, etc., from a license tax would exempt the importation of merchandise by a state from import duty. While the State might not prohibit importations, as it can the sale of liquor, by private individuals, yet paying no import duty it could undersell all individuals and so monopolize the importation and sale of foreign goods.

"Obviously, if the power of the State is carried to the extent suggested, and with it is relief from all Federal taxation, the National Government would be largely crippled in its revenues. Indeed, if all the States should concur in exercising their powers to the full extent, it would be almost impossible for the Nation to collect any revenues. In other words, in this indirect way it would be within the competency of the States to practically destroy the efficiency of the National Government."

The court then proceeds to review the authorities bearing upon the question of when an instrumentality of the state is subject to Federal taxation, and at page 461 of 199 U. S. (26 S. Ct. 116) further says:

"These decisions, while not controlling the question before us, indicate that the thought has been that the exemption of state agencies and instrumentalities from National taxation is limited to those which are of a strictly governmental character, and does not extend to those which are used by the State in the carrying on of an ordinary private business."

The court then takes up the distinction between the governmental powers exercised by a municipal corporation and the private powers exercised by such corporation and shows how, when a municipality engages in the latter, it is clothed with none of the immunities of sovereignty and is liable for negligent acts, and at page 463 of 199 U. S. (26 S. Ct. 117) further says:

"Now, if it be well established, as these authorities say, that there is a clear distinction as respects responsibility for negligence between the powers granted to a corporation for governmental purposes and those in aid of private business, a like distinction may be recognized when we are asked to limit the full power of imposing excises granted to

the National Government by an implied inability to impede or embarrass a State in the discharge of its functions. It is reasonable to hold that while the former may do nothing by taxation in any form to prevent the full discharge by the latter of its governmental functions, yet whenever a State engages in a business which is of a private nature that business is not withdrawn from the taxing power of the Nation.

"For these reasons we think that the license taxes charged by the Federal Government upon persons selling liquor is not invalidated by the fact that they are the agents of the State which has itself engaged in that business."

In the case of Flint v. Stone Tracy Co., 220 U. S. 107, at page 157, 31 S. Ct. 342, 351 (55 L. Ed. 389, Ann. Cas. 1912B, 1312), the Supreme Court adverted to its former opinion in South Carolina v. U. S., and said:

"In the previous opinion cases in this court here were reviewed, and the rule to be deduced therefrom stated to be that the exemption of state agencies and instrumentalities from national taxation was limited to those of a strictly governmental character, and did not extend to those used by the state in carrying on business of a private character."

It therefore becomes necessary to determine whether the Bank of North Dakota is an instrumentality of the state of a strictly governmental character or is an instrumentality of the state used to carry on a business of a private character.

It is well settled that when a state creates a corporation for the purpose of engaging in private business and acquires either a part or the whole of the capital thereof, it divests itself, so far as it concerns the transactions of such corporation, of its sovereign character and takes that of a private citizen. Instead of communicating to the corporation its privileges and prerogatives, it descends to the level of a private citizen. As to the transactions of such corporation, it cannot claim the privileges or immunities of a sovereign. Bank of U. S. v. Planters' Bank, 9 Wheat. 904, 6 L. Ed. 244; Curran v. Bank of the State of Arkansas, 15 How. 304, 308, 14 L. Ed. 705; Georgia v. Chattanooga, 264 U. S. 472, 481, 44 S. Ct. 369, 68 L. Ed. 796; Metropolitan Savings Bank & T. Co. v. Farmers' State Bank (C. C. A.) 20 F.(2d) 775, 779; Briscoe v. Bank of Kentucky, 11 Pet. 257, 323, 324, 9 L. Ed. 709; Darrington v. Bank of Alabama, 13 How. 12, 14 L. Ed. 30; Western Railway v. Carlton, 28 Ga. 180;

852

Gross v. Managers of World's Columbian Exposition, 105 Ky. 840, 49 S. W. 458, 43 L. R. A. 703.

The Supreme Court of North Dakota, in the case of Sargent County v. State, doing business as Bank of North Dakota, 47 N. D. 561, 182 N. W. 270, 272, 273, 274, expressly approved the doctrine of the cases last above cited. The question before the North Dakota court was whether the bank could be sued by a proceeding in garnishment. The court quoted from the opinion of Chief Justice Marshall in the Planters' Bank Case, as follows:

"It is, we think, a sound principle that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted."

Reviewing the case of Curran v. Bank of the State of Arkansas, supra, the North Dakota court said:

"It appeared that the bank of the state of Arkansas was incorporated by legislative act with the usual banking powers of discount, deposit, and circulation; that the state was its sole stockholder; that the capital stock of the bank consisted of $1,146,000 raised by the sale of state bonds and certain other sums. It was again held that a bank was a distinct trading corporation having a complete separate existence; enabled to enter into valid contracts by itself alone and having specific capital stock, provided and held out to the public, as a means to pay its debts; that the obligations of its contracts, the funds provided for their performance, and the equitable rights of its creditors, were in no way affected by the fact that a sovereign state paid in its capital and consequently became entitled to its property. It further reaffirmed the principle that a state by owning all of the capital stock does not impart to that corporation any of its privileges or prerogatives; that it lays down its sovereignty so far as respects the transactions of the corporation and exercises no power or privilege in respect to those transactions not derived from the charter."

We think it a fair deduction from this opinion that the North Dakota court is of the opinion that the Bank of North Dakota is engaged in a private business.

█ Counsel for the bank urge that a contrary conclusion must be drawn from the opinions in Green v. Frazier, Governor et al., 44 N. D. 395, 176 N. W. 11, and Id., 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878. In that case, the purposes for which the bank was created were considered in relation to the taxing power, and it was held that the bank was created for a public purpose, which would authorize the levy of taxes to pay the principal and interest on the bonds issued to provide capital for the bank. However, there is a distinction between public purpose and governmental function. The distinction is recognized in cases involving the exemption of property from taxes where property devoted to a public use is exempted. The authorities hold that "public purpose" is not synonymous with "governmental purpose." See Cooley on Taxation (4th Ed.) vol. 2, § 639; Corporation of San Felipe De Austin v. State, 111 Tex. 108, 229 S. W. 845, 847. This distinction is frequently noticed in cases involving the liability of municipal corporations for tort. In the case of Eastern Illinois State Normal School v. City of Charleston, 271 Ill. 602, 111 N. E. 573, L. R. A. 1916D, 991, the court said:

"In the creation of a system of waterworks and the operation of the same for the purpose of protection against fire, flushing sewers, or other uses pertaining to the public health and safety, the city is in the exercise of the police power and is therefore exercising a governmental function. * * * In supplying water for the use of the inhabitants for domestic and commercial purposes, a municipality is not in the exercise of a governmental power, but acts in the same capacity as a private corporation, although the business is carried on for the public advantage, and, being public in its nature, is impressed with a public use."

It will be observed that the Supreme Court in the case of South Carolina v. U. S., supra, noted the analogy between the two kinds of power exercised by a municipal corporation and the two kinds of function performed by instrumentalities of a state.

Is the Bank of North Dakota an instrumentality of the state used by such state in carrying on a business of a private character? The Bank of North Dakota has a capital. It has what amounts to a board of directors. It makes loans to privately owned banks and to individuals on real estate security. It receives deposits from the public generally. It may sue and be sued with reference to all its banking transactions.

"It possesses a status distinct and separate from that of the State itself, a status

f a state enterprise circumscribed by and dependent upon the rights, powers, and liabilities created by a specific statutory enactment." Its profits accrue to it as a bank and "are not public funds of the state for disbursement in governmental operation." Sargent County v. State, supra, 47 N. D. 561, 182 N. W. 270, 274, 275. While it is a depository of public funds, in this respect it merely succeeds to the functions formerly performed by privately owned depository banks. State v. Waters, 45 N. D. 115, 176 N. W. 913, 914. While it was created to promote the general welfare of the state, the people of the state, by an amendment to its Constitution recognized that such public welfare might be promoted by the state engaging in private business. We think these facts compel an affirmative answer to the question.

Furthermore, there is no limitation on the power of the state of North Dakota to engage in private business, and if the bank is exempt from federal taxation the way is open for the state of North Dakota to relieve its citizens from all Federal excise taxes. It was such a dangerous consequence which the Supreme Court sensed in South Carolina v. U. S., and which no doubt had a controlling influence upon the decision of the court in that case.

It is our conclusion that the Bank of North Dakota, while an instrumentality of the state, is one created by the state to engage in carrying on business of a private character and that as such it is subject to the excise tax imposed by section 1000(a) of the Revenue Acts of 1918 and 1921.

The decree is affirmed with costs.