**LANGER** et al. v. **UNITED STATES.** *
No. 10204.

Circuit Court of Appeals, Eighth Circuit.
May 7, 1935.

*Rehearing denied June 8, 1935.

Francis Murphy and George W. Thorp, both of Fargo, N. D., and James H. Harkless, of Kansas City, Mo., for appellants.

P. W. Lanier, U. S. Atty., of Fargo, N. D. (Harry Lashkowitz, Asst. U. S. Atty., of Fargo, N. D., and Donald M. Murtha, Asst. U. S. Atty., of Dickinson, N. D., on the brief), for the United States.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

The appellants were convicted under an indictment charging violation of the provisions of section 37 of the Criminal Code (R. S. § 5440, 18 USCA § 88). The indictment charges appellants and four other defendants, Joseph A. Kinzer, Paul J. Yoeter, G. A. Hample, and Oscar Erickson, with conspiring to administer corruptly and to cause the corrupt administration of certain acts of Congress for the promotion of their own political interests and for their own financial gain and profit, contrary to the true intent and policy of said acts, wasteful of the money so appropriated, and prejudicial to the interests and welfare of the United States, and the public service thereof. At the close of the government's case, the defendants Joseph A. Kinzer, Paul J. Yoeter, and G. A. Hample were, on direction of the court, acquitted. The defendant Oscar Erickson was not tried.

The acts of Congress specified are: (1) The act approved July 21, 1932, 47 Stat. 709, see 15 USCA § 605 et seq.; (2) the act approved May 12, 1933, c. 30, 48 Stat. 55, 15 USCA §§ 721–727, 728; and (3) the act of Congress approved June 16, 1933, 48 Stat. 195, 15 USCA §§ 701–712.

As there is no contention that there was evidence of a conspiracy to obstruct or corruptly administer the act of Congress approved June 16, 1933, we shall make no further reference to it.

The sufficiency of the indictment was challenged by demurrer, by motion to quash, by motion for new trial, and by motion in arrest of judgment, all of which were overruled.

It appears from the record that appellant Langer was elected Governor of North Dakota in January, 1933, for a term of two years. He immediately appointed a relief committee composed of prominent citizens of the state of North Dakota. Appellant Kinzer was appointed as executive secretary of the state emergency relief committee March 9, 1933, and continued as such until the latter part of August, 1933. Appellant Vogel was the state highway commissioner, appointed July 15, 1933. Appellant Chaput was the business manager of a newspaper published at Bismarck, known as the Leader, and appellant McDonald was a solicitor for that newspaper. Chaput had a desk in Gov. Langer's official office, and performed duties of a private secretary to the Governor.

Stated without detail, the evidence in substance shows that the appellants belonged to the same political party or faction in North Dakota, the Nonpartisan League, and the government contends that the evidence shows a plan to compel and coerce clerks and employees engaged in distributing the funds provided by the federal statutes above mentioned for the relief of the needy in North Dakota to contribute 5 per cent. of their annual salaries for the personal uses of appellants, principally for the purpose of making it possible for appellants to purchase and conduct for their benefit and the defense and promotion of their political organization a newspaper called the Leader.

In support of their challenge to the indictment, appellants contend:

(1) That the Reconstruction Finance Corporation, whether acting through its board of directors, or through the Federal Emergency Relief Administrator (sections 603 and 723 (a), title 15 USCA), is not the government of the United States, and that the moneys made available by that corporation to the several states pursuant to the provisions of the acts of Congress involved came out of its funds.

The indictment charges "that the defendants, each and all of them, willfully, unlawfully, knowingly and feloniously combined, conspired, confederated and agreed together that they would corruptly administer and procure the administration of said Acts of Congress for the promotion of their own political interests, and for their own financial gain and profit, contrary to the

true intent and policy of said Acts, wasteful of the money so appropriated and apportioned, and prejudicial to the interest and welfare of the United States and the public service thereof."

The overt acts charged consist principally of the solicitation of funds from the clerical help employed in North Dakota to assist in the management and distribution of such funds as came to North Dakota from the Reconstruction Finance Corporation and the Federal Emergency Relief Administrator.

The capital which the Reconstruction Finance Corporation uses is raised by subscription to its capital stock by the United States, and by borrowing. A part of the money of the corporation was allocated and made available to the Secretary of the Treasury to make payment on stock of the Federal Home Loan Banks subscribed for by him, and to the Secretary of Agriculture for relief of agriculture. Management of the corporation is vested in a board of directors consisting of the Secretary of the Treasury, or, in his absence, the Under Secretary of the Treasury, and six other persons appointed by the President by and with the advice and consent of the Senate. The corporation has power "to select, employ, and fix the compensation of such officers, employees, attorneys, and agents as shall be necessary for the transaction of the business of the corporation, without regard to the provisions of other laws applicable to the employment and compensation of officers or employees of the United States." Section 604, 15 USCA. Free use of the United States mail is granted to the corporation, and obligations issued under section 609 are fully and unconditionally guaranteed by the United States, and it is provided that "all redemptions, purchases, and sales by the Secretary of the Treasury of the obligations of the corporation shall be treated as public-debt transactions of the United States." Section 609. If default is made in payment, the Secretary of the Treasury is directed to pay the amount thereof. "The Secretary of the Treasury, at the request of the Reconstruction Finance Corporation, is authorized to market for the corporation its notes, debentures, bonds, and other such obligations, using therefor all the facilities of the Treasury Department now authorized by law for the marketing of obligations of the United States. The proceeds of the obligations of the corporation so

marketed shall be deposited in the same manner as proceeds derived from the sale of obligations of the United States, and the amount thereof shall be credited to the corporation on the books of the Treasury." Section 609. "The corporation, with the consent of any board, commission, independent establishment, or executive department of the Government, including any field service thereof, may avail itself of the use of information, services, facilities, officers, and employees thereof in carrying out the provisions of this chapter." Section 604.

The Federal Reserve Banks are authorized and directed to act as depositories, custodians, and fiscal agents for the Reconstruction Finance Corporation in the general performance of its powers. Section 607. Borrowing by the corporation is subject to the approval of the Secretary of the Treasury, and property of the corporation is wholly exempt from taxation, except that its real estate is made subject to local taxation. The Secretary of the Treasury is made a liquidating officer of the corporation. Quarterly reports must be made to Congress, and monthly reports to the President and Senate and House of Representatives. False statements, willful overvaluation of security in applying for loans, forgery, counterfeiting, altering the written obligations of the corporation, embezzlement from it, false entries in its books, fraudulent participation in any transaction of the corporation, and giving unauthorized information concerning future action or plans of the corporation are punished as crimes. Section 616 (a–c). Unauthorized use of the words "Reconstruction Finance Corporation" is punished as a crime. When designated for that purpose by the Secretary of the Treasury, the corporation shall be a depository of public money, excepting receipts from customs, under such regulations as the Secretary of the Treasury may adopt. It may also perform all such reasonable duties as depository of public money and financial agent of the government as may be required of it. Section 612.

The question to be determined is whether Congress has created a corporate entity to act as a part of the government as a political department, or whether it has adopted a corporate form to be separate from and not to be considered as a part of the government. This question can only be determined by a consideration of the acts viewed in the light of the decisions

of the Supreme Court. In a number of cases it has been held that it was the intent of Congress to create a corporation so separate and distinct as to retain its own individuality, and, hence, to share none of the privileges, immunities, or disabilities of the government. United States v. Strang, 254 U. S. 491, 41 S. Ct. 165, 166, 65 L. Ed. 368; United States ex rel. v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. 131; Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244; Bank of Kentucky v. Wister, 2 Pet. 318, 7 L. Ed. 437; Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp., 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762.

Thus, in United States v. Strang, supra, it was held that the United States Shipping Board Emergency Fleet Corporation, which was incorporated under the laws of the District of Columbia, under authority of an act of Congress, was a separate entity from the United States, although the government owned all of its $50,000,000 capital stock. The precise question before the court was whether employment of one as an inspector by the corporation "without more" made him an agent of the government within section 41 of the Criminal Code (section 93, 18 USCA). The President had directed that a portion of the power and authority vested in him in respect to ships should be exercised through the corporation. In the course of the opinion it is said: "The corporation was controlled and managed by its own officers, * * * who became directly responsible to it. Notwithstanding all its stock was owned by the United States it must be regarded as a separate entity. Its inspectors were not appointed by the President, nor by any officer designated by Congress; they were subject to removal by the corporation only and could contract only for it. In such circumstances we think they were not agents of the United States within the true intendment of section 41."

Upon the authority of this case, and Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corporation, supra, it was held in United States ex rel. v. McCarl, supra, that claims arising out of contracts with the Emergency Fleet Corporation were not within the jurisdiction of the Comptroller General.

In Bank of the United States v. Planters' Bank of Georgia, supra, Chief Justice Marshall announced the rule that ownership of shares in a private corporation does not change the character of the corporation. To the same effect see: Bank of Kentucky v. Wister, supra; State of North Dakota v. Olson (C. C. A. 8) 33 F.(2d) 848.

In Salas v. United States (C. C. A. 2) 234 F. 842, it appeared that the United States owned all the capital stock of a railroad that had been privately incorporated, and it was held not to be a department of the government. In that case the court stressed the continuance of the original corporate organization by the government for its own purposes, among others to avoid the restrictions of certain laws of the United States applicable to the Isthmian Canal Commission. The court held that in entering private business the government had abandoned its sovereign capacity.

These precedents seemed to warrant the conclusion that (1) it is not sufficient that a private corporation is an instrumentality of the United States to defeat the doctrine of separate entities; nor (2) is it sufficient that the government owns all of the stock in the corporation.

There are other cases in which it has been held that the doctrine of separate entity was not applicable. Among these we cite the following: United States v. Walter, 263 U. S. 15, 44 S. Ct. 10, 11, 68 L. Ed. 137; United States Grain Corp. v. Phillips, 261 U. S. 106, 43 S. Ct. 283, 285, 67 L. Ed. 552; United States v. Carlin (D. C.) 259 F. 904; United States v. Union Timber Products Co. (D. C.) 259 F. 907; United States v. Clallam County, Wash. (D. C.) 283 F. 645, affirmed as Clallam County, Wash., v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328; Port Angeles Western R. Co. v. Clallam County, Wash. (C. C. A. 9) 44 F.(2d) 28.

In United States v. Walter, supra, the third count of the indictment under consideration charged a conspiracy under section 37, Criminal Code (section 88, 18 USCA), by making and presenting for payment a fraudulent claim against the United States Emergency Fleet Corporation. It was held that this third count was not demurrable, and in the course of the opinion by Mr. Justice Holmes, it is said: "As to the third count, while it is true that the corporation is not the United States, United States v. Strang, 254 U. S. 491, 41 S. Ct. 165, 65 L. Ed. 368, the contemplated fraud upon the corporation if successful would have resulted directly in a

pecuniary loss to the United States, and even more immediately would have impaired the efficiency of its very important instrument. We are of opinion that it was within the words of section 37 'defraud the United States in any manner' and that on this as on the other point the decision below was wrong."

In United States Grain Co. v. Phillips, supra, the defendant United States Grain Corporation was a trading corporation organized under the laws of Delaware, pursuant to an Executive Order dated August 14, 1917, as an agency to enable the United States Food Administration to buy, store, and sell wheat among other things. The stock, except seven shares necessary to qualify seven directors, was held by the United States. By an Executive Order of June 21, 1918, the defendant was designated an agency of the United States under the control of the United States Food Administrator to buy, hold, and sell wheat. It is recited in the opinion that: "A later Act of February 25, 1919, c. 38, 40 Stat. 1161 (Comp. St. Ann. Supp. 1919, § 7706a), made a large appropriation to furnish foodstuffs for the relief of populations outside of Germany, German-Austria, Hungary, Bulgaria, and Turkey, etc. This was carried out by an Executive Order of March 1, to the effect that the furnishing should be conducted under the direction of Mr. Hoover, who was authorized to establish the American Relief Administration to that end, and particularly to employ the Food Administration Grain Corporation as an agency for transporting and distributing foodstuffs and supplies to the populations requiring relief."

It is then recited that by later act the President was authorized to make necessary orders and to utilize any department or agency of the government, including the Food Administration Grain Corporation; that the President, pursuant to authority, authorized the defendant to buy and sell wheat. Plaintiff was an officer of the United States Navy, and, as such, entitled to a percentage on gold received on board and carried as freight upon his responsibility. The vessel under his command had transported gold across the seas for the United States Grain Corporation. If this gold were carried for the United States government, he was not entitled to receive this compensation, but if carried for others he was entitled to receive it. In the course

of the opinion denying the right of recovery, it is, among other things, said:

"We mention these details to show that the defendant although in form a private corporation and liable to be sued as such, was organized and owned by the United States as an agency for public service, was not engaged in ordinary merchandising, but under Mr. Hoover's directions was performing public functions arising out of the war and its sequels. * * *

"In substance the gold was the property of the United States. It is true that the legal title was in the Corporation, that the property of the Corporation might have been taken to pay a judgment against it, and that in other ways the difference of personality would be recognized. Sloan Shipyards Corporation v. United States Shipping Board Emergency Fleet Corporation, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762. But for purposes like the present imponderables have weight. When as here the question is whether the property was clothed with such a public interest that the transportation of it no more could be charged for by a public officer than the carrying of a gun, we must look not at the legal title only but at the facts beneath forms."

In United States v. Clallam County, Wash. (D. C.) 283 F. 645, 648, the United States and the United States Spruce Production Corporation brought suit to enjoin collection of taxes on the property of the United States Spruce Production Corporation. In the course of the opinion in that case it is said: "Freedom of corporate action or power of control by the Spruce Production Corporation in this case is mere fiction. All of its acts were directed and controlled by the President of the United States through the several departments authorized by the Congress, and the claim is not predicated upon any act of omission or of commission, and the corporation was a mere instrumentality or agency for doing the bidding of the President of the United States."

The right of the state to tax the property was denied. While the decision is that of a District Court, it was affirmed by the Supreme Court in Clallam County, Wash., v. United States, 263 U. S. 341, 44 S. Ct. 121, 122, 68 L. Ed. 328, where the court said: "The incorporation and formal erection of a new personality was only for the convenience of the United States to carry out its ends."

A consideration of the Reconstruction Finance Corporation Act and the Federal Emergency Relief Act of 1933 convinces that Congress intended this corporation to be an agency of the United States. The powers conferred upon the corporation are not such as are vested in any ordinary corporation, and Congress in many ways has manifested an intent to have it regarded as an agency of the government. It is not necessary to decide whether the money was that of the United States. It is sufficient that a conspiracy to obstruct the proper use of the funds of the Reconstruction Finance Corporation is charged, that is an impediment to the exercise of a function by the federal government. As said in Haas v. Henkel, 216 U. S. 462, 30 S. Ct. 249, 254, 54 L. Ed. 569, 17 Ann. Cas. 1112, in considering section 88, 18 USCA (section 37, Cr. Code), it "is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." It is not essential that such a conspiracy shall contemplate a financial loss to the government, nor that one shall have resulted. In Hammerschmidt v. United States, 265 U. S. 182, 44 S. Ct. 511, 512, 68 L. Ed. 968, Chief Justice Taft, critically considering Haas v. Henkel, supra, approves the principle there announced. It is there said: "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention."

We are not without precedent in our own court. In Green v. United States (C. C. A.) 28 F.(2d) 965, 968, the indictment charged that one Exie Fife, a full-blooded restricted Creek Indian, had an allotment of 160 acres of land in Oklahoma, from which there had been derived incomes, profits, rents, and royalties from an oil and gas mining lease covering the restricted allotment of land; that this money had been received into the hands of the superintendent for the Five Civilized Tribes, and in-

to the departmental office over which he presided, in trust for the uses and purposes provided by law; and that he had received approximately $250,000. Exie Fife married Berlin Jackson, a white man, and then, desiring separation, entered into a property settlement and separation agreement with her husband, agreeing to pay him $10,000. The conspiracy alleged was that the defendants were to deceive the superintendent and lead him to believe that Berlin Jackson had refused to accept less than $50,000; that unless the superintendent would approve such a settlement, and permit payment of that sum to be made from the restricted moneys of Exie Fife, she would be subjected to a criminal prosecution at the instance of her husband, and would be driven either to kill him or commit suicide; and that the money was to go entirely to Jackson, and was for the best interest of the ward. The conspiracy in that case was successful, and division of the larger sum was made among the defendants. This court, in an opinion by Judge Van Valkenburgh, affirmed a conviction, and held that the allegations of the indictment were sufficient to charge a conspiracy to obstruct the federal government.

It is urged by appellants that there is a distinction between a corporation engaged in assisting the government in the performance and carrying out of governmental functions, and one engaged in commercial enterprises. Corporations organized to assist in carrying on a war are cited as examples of the first class of corporation. Without determining the soundness of this contention, it is sufficient to observe that one of the powers with which the Reconstruction Finance Corporation is vested is to act as a depository of public money where designated for that purpose by the Secretary of the Treasury, and it may also be employed as a financial agent of the government. Section 612, 15 USCA. Thus it is specifically made a fiscal agent of the government and a depository of governmental funds. As early as McCulloch v. Maryland, 4 Wheat. 316, 422, 4 L. Ed. 579, the incorporation of a bank by the federal government was upheld as constitutional, the court saying: "If a corporation may be employed indiscriminately with other means to carry into execution the powers of the government, no particular reason can be assigned for excluding the use of a bank, if required for its fiscal operations."

Approving the doctrine of McCulloch v. Maryland, the Supreme Court, in Smith v.

Kansas City Title & Trust Co., 255 U. S. 180, 41 S. Ct. 243, 248, 65 L. Ed. 577, held constitutional legislation establishing federal land banks and joint stock land banks. These corporations, when designated by the Secretary of the Treasury, were made depositories of public money, and they too were subject to employment as financial agents of the government, and were required to perform such reasonable duties as depositories of public moneys and fiscal agents as might be required of them. Federal Farm Loan Act of July 17, 1916, 39 Stat. 360, c. 245, as amended January 18, 1918, 40 Stat. 431, c. 9. In the course of the opinion, the court said:

"It is said that the power to designate these banks as such depositaries has not been exercised by the government, and that the Federal Land Banks have acted as federal agents only in the case of loans of money for seed purposes made in the summer of 1918, to which we have already referred. But the existence of the power under the Constitution is not determined by the extent of the exercise of the authority conferred under it. Congress declared it necessary to create these fiscal agencies, and to make them authorized depositaries of public money. Its power to do so is no longer open to question.

"But, it is urged, the attempt to create these federal agencies, and to make these banks fiscal agents and public depositaries of the government, is but a pretext. But nothing is better settled by the decisions of this court than that, when Congress acts within the limits of its constitutional authority, it is not the province of the judicial branch of the government to question its motives. * * *

"We therefore conclude that the creation of these banks, and the grant of authority to them to act for the government as depositaries of public moneys and purchasers of government bonds, brings them within the creative power of Congress although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest."

Not only did Congress have the power to create an agency to act as official agent and depository of the government, but it has conferred upon the Reconstruction Finance Corporation power to serve "governmental purposes declared by Congress in their creation." Smith v. Kansas City Title & Trust Co., supra. We conclude that

this corporation was a direct agency for furthering and carrying out powers conferred upon the federal government by the Constitution, and the distinction which appellants attempt to make cannot be sustained.

■ (2) Appellants next contend that the indictment charges no offense because if the money were money of the United States prior to its being turned over to North Dakota officials, it then ceased to be such, and appellants could not obstruct nor defeat the administration of the federal statutes because they were administering funds belonging to the state, and were not federal officials. In this connection it is urged that it was the intent to pass full and complete title to the money when the Reconstruction Finance Corporation, or the Administrator under the Federal Emergency Relief Act of 1933, loaned it to the state, or otherwise devoted it to the use of the state. Whether the money is granted or loaned by the Reconstruction Finance Corporation or the Administrator under the Federal Relief Act of 1933, it is money of the Reconstruction Finance Corporation. Section 605a and section 722 of title 15 USCA.

Under section 605a of title 15 USCA, loans by the Reconstruction Finance Corporation to states are authorized. The money is made available "to the several States and Territories, to be used in furnishing relief and work relief to needy and distressed people and in relieving the hardship resulting from unemployment." The act provides that loans shall be reimbursed to the corporation by making annual deduction beginning with the year 1935, from regular apportionments made from future federal authorizations in aid of the states and territories for the construction of highways and rural post roads, of an amount equal to one-fifth of the share which such state or territory would be entitled to receive under such apportionment except for the provisions of section 605a (a), or of an amount equal to one-fifth of the amounts so paid to the Governor of such state or territory pursuant to section 605a (a), whichever is lesser until the sum of such deductions equals the total amounts paid under this section and all accrued interest thereon. An alternative method of settlement by agreement is provided.

Section 605a (c) provides: "The governor of any State or Territory may from time to time make application for funds

under this section, and in each application so made shall certify the necessity for such funds and that the resources of the State or Territory, including moneys then available and which can be made available by the State or Territory, its political subdivisions, and private contributions, are inadequate to meet its relief needs. All amounts paid to the governor of a State or Territory under this section shall be administered by the governor, or under his direction, and upon his responsibility. The governor shall file with the corporation and with the auditor of the State or Territory (or, if there is no auditor, then with the official exercising comparable authority) a statement of the disbursements made by him under this section."

If a gift to a state is absolute and without limitation of its power, there may be an implied obligation to carry out the purposes of the gift, but it is honorary. Alabama v. Schmidt, 232 U. S. 168, 34 S. Ct. 301, 58 L. Ed. 555; United States v. Louisiana, 127 U. S. 182, 8 S. Ct. 1047, 32 L. Ed. 66; Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338; Mills County v. Burlington & M. R. Co., 107 U. S. 557, 2 S. Ct. 654, 27 L. Ed. 578; King County, Wash., v. Seattle School District, 263 U. S. 361, 44 S. Ct. 127, 68 L. Ed. 339; Hagar v. Reclamation Dist., 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569. On the strength of these authorities, appellants contend that the money could be used in any manner they saw fit. In our view, the authorities do not sustain this contention. Congress can inquire into the manner of the execution of this duty by the state. An agreement in the nature of a conspiracy to defeat the application of the funds to their statutory purpose is within the rule of Haas v. Henkel, supra, and, as before observed, pecuniary loss is not essential. The obstruction to the administration of a federal statute, and the impairment of any lawful function is prohibited by section 88, 18 USCA. A similar contention was made in Green v. United States, supra, in response to which it is said: "Incidentally, it is urged that Berlin Jackson had a right to employ attorneys and to pay them whatever he chose, even though the understanding was that the money was to go to him. But the gist of the action is that the deception practiced, which interfered with the function of government and perpetrated a fraud, procured the payment of an excessive sum to Berlin Jackson, whether for himself or for attorneys, and that if the true facts had been known no such payment would or should have been made."

The salaries paid the clerical help may well have been excessive to enable the employees to comply with the demand made for contributions. Money intended for relief of the distressed would thereby be diverted from its intended purpose to the uses of appellants. A conspiracy to use the power of position to compel contributions out of such salaries, whether excessive or not, would obstruct the administration of the statute and the accomplishment of its purposes, because efficiency and morale might thereby be lowered.

What we have said is equally applicable to the Federal Emergency Relief Act of 1933. Direct grants for relief of distress caused by unemployment are made to the states. Sections 721 and 724, 15 USCA. Section 723 (b) provide for a closer supervision in the use of the funds than under the original Reconstruction Finance Corporation Act. This section provides that: "The Administrator may, under rules and regulations prescribed by the President, assume control of the administration in any State or States where, in his judgment, more effective and efficient cooperation between the State and Federal authorities may thereby be secured in carrying out the purposes of this chapter."

■ (3) But it is urged that fraud is not charged by the indictment. We conclude that this contention of appellants cannot be sustained. Great reliance is placed upon what is said in Fasulo v. United States, 272 U. S. 620, 47 S. Ct. 200, 71 L. Ed. 443, and Hammerschmidt v. United States, 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968. We have heretofore adverted to the question of fraud. So far as the indictment is concerned, there is sufficient allegation of a conspiracy to defraud. Wright v. United States (C. C. A. 5) 108 F. 805; United States v. Moore (C. C.) 173 F. 122: Curley v. United States (C. C. A. 1) 130 F. 1; McGregor v. United States (C. C. A. 4) 134 F. 187; Wallenstein v. United States (C. C. A. 3) 25 F.(2d) 708; Goldsmith v. United States (C. C. A. 2) 42 F.(2d) 133.

■ (4) It is urged that these relief acts are unconstitutional because not within the powers granted the federal government. The gist of the offense charged, however, is the conspiracy, and there is no doubt of

the constitutionality of the statute under which the indictment is drawn, and any attack upon these emergency acts is at most in the nature of a collateral attack, and the indictment would still charge a conspiracy to defraud even though the statutes involved in the overt acts might be unconstitutional. We have already pointed out that the acts involved specifically create the Reconstruction Finance Corporation a fiscal agent and a depository of public funds, and Congress had constitutional authority so to do. McCulloch v. Maryland, supra; Smith v. Kansas City Title & Trust Co., supra; Osborn v. Bank of United States, 9 Wheat. 738, 6 L. Ed. 204; First Nat. Bank of Bay City v. Fellows ex rel. Union Trust Co., 244 U. S. 416, 37 S. Ct. 734, 61 L. Ed. 1233, L. R. A. 1918C, 283, Ann. Cas. 1918D, 1169.

Article 1, section 8, of the Constitution bestows upon Congress the power "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." The theory that the power of Congress to appropriate money for the general welfare is confined to the enumerated powers expressed in article 1 of the Constitution finds no support in the long continued practice of Congress. Moneys have been appropriated from time to time from the United States Treasury for purposes outside of the enumerated powers, and this long continued practical construction of the Constitution by Congress is entitled to great respect. Myers v. United States, 272 U. S. 52, 47 S. Ct. 21, 71 L. Ed. 160; United States v. Eaton, 169 U. S. 331, 18 S. Ct. 374, 42 L. Ed. 767; McPherson v. Blacker, 146 U. S. 1, 13 S. Ct. 3, 11, 36 L. Ed. 869. In the last-cited case, it is said: "The construction to which we have referred has prevailed too long and been too uniform to justify us in interpreting the language of the constitution as conveying any other meaning than that heretofore ascribed, and must be treated as decisive."

The practice of Congress in making appropriations has been consistent with the view that it is authorized to raise and appropriate money for any public purpose connected with the general national welfare. This construction of the Constitution was sponsored by Hamilton and Monroe, with whom Mr. Justice Story concurred. 2 Story, Commentaries on the Constitution of the United States (2d Ed.) 153; 1 Story, Commentaries on the Constitution of the United States (2d Ed.) 978. This contention of appellants cannot be sustained.

■ (5)· It is next contended that these emergency acts are invalid because they set up a system of government by co-operation between the federal government and the states applying for aid, but no power of the state is invaded because the state has an option of either accepting or rejecting. Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078. Certainly, no personal right of any appellant is infringed, and if there is a surrender of political power or an invasion of such power, still only an abstract question of political constitutional law would be presented, with which the courts are not concerned.

We are of the view that the indictment states a public offense, and that the court did not err in so holding.

■ The sufficiency of the evidence to sustain the conviction of appellants is vigorously assailed. There is no substantial dispute in the material evidence, though the parties do not agree as to what inferences may properly be drawn from the facts proven. There was an agreement and plan participated in by the appellants, the purpose and object of which was to assess state employees a certain per cent. of their salaries, in order to establish and maintain a party newspaper to advance the political principles sponsored by Gov. Langer and his associates. A government witness, speaking on this subject, says: "Well, it was explained to me that they proposed to sell subscriptions to the various employes of the State for a percentage of their salary and these State employes for every dollar that they turned in that they were to get a subscription valued at a dollar, which they in turn were to sell and keep the money so obtained for themselves to reimburse themselves. As far as I know, five per cent of the salaries was to be collected for this purpose."

Another witness produced by the government, an employee of the state highway department, testified as follows: "As I understood Mr. Chaput's proposition, it was to establish a Nonpartisan League paper. He thought the name of the paper would be the Leader. He explained to me that I would pledge—I would subscribe to a certain number of subscriptions which I could sell and get my money back. He told me that he wanted me to contribute

five per cent of my salary toward this paper."

Defendant Langer, in his testimony on the subject, says: "The system of getting subscribers that I devised was this: I felt that an employee who held a position under the State Government owed, at least, sufficient duty to the administration to be willing to go out and assist the administration in securing a large circulation for a weekly newspaper. I felt that if they sold newspapers or subscriptions to an amount of totaling five per cent of their annual salary that that would not be asking anything too much of them, especially in view of the fact that the salaries of all of the State officials themselves (as distinguished from employees) had just been reduced twenty per cent by the passage of a law."

After testifying that he secured a Mr. Erickson to take exclusive charge of the paper, he says: "As to whether or not he would take charge of the matter of getting these subscribers and the soliciting of the State employees to get subscribers, he said he would take care of all of that."

The witness further testified: "With reference to this plan of getting the subscribers and the assessment, there was no secrecy about it adopted by me. I talked about it publicly in my speeches over the state; the first speech I gave was at Vorona in LaMoure County. I went into that matter in great detail and in effect explained it to the public of the State like I have here on the stand. * * * In addition to my outlining this plan to the people of the State in my speeches, this plan was described in detail later in the Leader, and in some advertisements in that connection."

The government contends that it may properly be inferred from the evidence that appellants also had in mind assessing employees of the Federal Emergency Relief Administration of North Dakota engaged in the administration of the relief funds. The gist of the offense, as has already been stated, is the alleged conspiracy to obstruct the administration of a governmental function. It is not claimed that the overt acts charged in themselves constituted substantive offenses. Unless there was such a conspiracy, the conviction of appellants cannot be sustained. Whatever we may think of the ethics or propriety of the practice employed by appellants to secure funds for political purposes, it is not a matter of concern to the federal government, unless some lawful governmental function was thereby obstructed. In other words, a conspiracy or plan to assess state employees was not an act violative of any federal statute, and hence, so far as the federal government is concerned, not criminal. So far as the direct evidence of any plan or conspiracy for the collection of these funds is concerned, it was confined to the assessment of state employees. We have searched the record diligently for direct evidence of any plan beyond this, and counsel for the government have called our attention to no such testimony.

It is urged that such a conspiracy may be inferred from the overt acts of the parties and the surrounding facts and circumstances. It is true that overt acts and the circumstances under which they are committed may be considered in connection with other evidence in support of the charge of conspiracy. Conspiracy is in fact rarely susceptible of direct proof. Safarik v. United States (C. C. A. 8) 62 F.(2d) 892; Goode v. United States (C. C. A. 8) 58 F.(2d) 105; Feigenbutz v. United States (C. C. A. 8) 65 F.(2d) 122; Dahly v. United States (C. C. A. 8) 50 F.(2d) 37, 42.

In the last cited case, it is said: "Proof of the overt acts may or may not be sufficient to prove the conspiracy. This will depend upon the character of the overt acts; not whether they are criminal per se or not, but whether they are of such character separately or collectively that they are clearly referable to a preagreement or conspiracy of the actors. If the jury is satisfied, beyond a reasonable doubt, from the evidence that such is the character of the overt acts proven, the jury may find the preexistence of the conspiracy. Otherwise, evidence independent of the overt acts is necessary to prove the conspiracy."

■ It appears from the evidence that while appellant McDonald was acting as a solicitor for the Leader, he solicited subscriptions from certain clerks in the state emergency relief office. The total of pledges from relief employees was $469.50, while the total pledges from state employees was $58,282.22. There is evidence that there was a sign on the door where these relief clerks were employed, referring to "State Emergency Relief." McDonald's testimony is to the effect that he did not know that these employees were not employees of the state of North Dakota, or that they had any connection with the federal government. The North Dakota Capitol building

had been burned down, and the state officers were scattered throughout Bismarck. In view of the positive proof introduced by the government itself that the plan or conspiracy as it was originally formed contemplated soliciting funds from state employees only, the overt acts are quite consistent with the contention of appellants that there was no plan to solicit federal employees, and that the act of McDonald in soliciting such employees, not being in furtherance of the plan or conspiracy, was not binding upon his associates.

■■■■ If we assume, as we must, that the solicitation of these funds from state employees was not violative of any federal statute, then the evidence, including that as to the overt acts, was as consistent with the innocence of the appellants as with their guilt, and so far as the vital issue here is concerned, to wit, the existence of the conspiracy charged in the indictment, it rests entirely upon circumstantial evidence. As said in Dahly v. United States, supra: "Guilt must be established beyond a reasonable doubt, and, where the evidence is as consistent with innocence as with guilt, no conviction can properly be had. Even participation in the offense which is the object of the conspiracy does not necessarily prove the participant guilty of conspiracy. The evidence must convince that the defendant did something other than participate in the offense which is the object of the conspiracy. There must, in addition thereto, be proof of the unlawful agreement and participation therein, with knowledge of the agreement." See, also, Tingle v. United States (C. C. A. 8) 38 F.(2d) 573, 575; Linde v. United States (C. C. A. 8) 13 F.(2d) 59; Ribaste v. United States (C. C. A. 8) 44 F.(2d) 21, 22; Tinsley v. United States (C. C. A. 8) 43 F.(2d) 890; Read v. United States (C. C. A. 8) 42 F.(2d) 636; Salinger v. United States (C. C. A. 8) 23 F.(2d) 48.

In Tingle v. United States, supra, which was a conspiracy case, this court, in an opinion by Judge Van Valkenburgh, said:

"But in conspiracy cases, the unlawful combination, confederacy, and agreement between two or more persons, that is, the conspiracy itself, is the gist of the action, and is the corpus delicti charged. It is, therefore, primarily essential to establish the existence of a confederation or agreement between two or more persons before a conviction for conspiracy to commit an offense against the United States can be sustained. * * *

"The evidence was unconflicting and was that of the government alone. In such case, when the circumstances relied upon are as consistent with innocence as with guilt, they are robbed of all probative value."

In Ribaste v. United States, supra, in considering a case, the evidence in which was circumstantial, we said: "The facts and circumstances proved and relied upon by the government to sustain Ribaste's conviction must therefore not only be consistent with his guilt, but must be inconsistent with his innocence."

But it is contended by the government that the scheme or plan that was confessedly agreed upon and participated in by the appellants in soliciting funds from state employees was itself unlawful because violative of certain North Dakota statutes. But if this were true, and we may say in passing that we think it was not, it would simply constitute a separate and distinct conspiracy and could not be substituted for the conspiracy charged in the indictment. Tinsley v. United States, supra.

The so-called similar offense must, of course, be a criminal one because criminality cannot be proved by proving innocence, and the act relied upon as constituting a similar offense must have been an offense when committed. Haywood v. United States (C. C. A. 7) 268 F. 795. The acts of solicitations of state employees could, therefore, have no bearing on the question of intent, nor on the vital question of conspiracy.

■■■■ One of the grounds urged on the motion for new trial was that the jury was guilty of improper conduct, in that its members read hostile newspaper articles during the progress of the trial. The practice disclosed by the record in this regard is not to be commended. It, however, appears that counsel for appellants knew that the jury were receiving, and presumably reading, the newspapers, yet failed to call the matter to the attention of the court, made no protest, complaint, nor objection, and did not at the time move for a mistrial nor for a dismissal of the jury, but took his chances on the effect the reading of these papers might have on the jury. There is nothing to indicate that this improper conduct on the part of the jury was occasioned by any one in behalf of the government,

and the matter must largely be left to the discretion of the trial court. The lower court, in its discretion, denied appellants' motion for a new trial based on this ground, and its action in this regard is not ordinarily reviewable on appeal.

Other alleged errors are discussed in briefs of counsel, but as the case must be reversed because of the insufficiency of the evidence, no good purpose would be served by further extending this opinion.

For the reasons herein stated, the judgment appealed from is reversed and the cause remanded with directions to grant appellants a new trial.