**UNITED STATES ex rel. MARCUS et al.
v. HESS et al.
No. 748 Civil.**

District Court, W. D. Pennsylvania.

Aug. 12, 1941.

---

[1] No opinion for publication.

200

See also, D.C., 1 F.R.D. 282.

Charles Margiotti, Joseph Rossi, and Joseph Reich, all of Pittsburgh, Pa., for plaintiff.

Eugene Strassburger, Wm. Eckert, John Nicklas, Jr., and J. V. Burke, Jr., all of Pittsburgh, Pa., for defendants.

SCHOONMAKER, District Judge.

This is an informer's action based on Section 5438 and Sections 3490 to 3494, inclusive, of Revised Statutes, 18 U.S.C.A. § 80, 31 U.S.C.A. §§ 231–235, in relation to false claims against the United States. The case, on trial from December 2, 1940, to March 22, 1941, resulted in a verdict in favor of plaintiff and against all the defendants—except the defendant Carmack—in the sum of $315,100.91. All the defendants, except Carmack, have moved for judgment in their favor, non obstante veredicto, or, in lieu thereof, for a new trial.

The suit charges the Electrical Contractors Association of Pittsburgh, Inc., its officers, general manager, and members, with a conspiracy to defraud the United States, a department or officer thereof, in the matter of electrical works on PWA projects, by obtaining or aiding to obtain the payment or allowance of false or fraudulent claims for such electrical work against the United States. That is made an offense by Section 5438, R.S. Section 3490, R.S., provides that any person who shall do or commit any of the acts prohibited by the provisions of Section 5438, shall forfeit and pay to the United States the sum of $2,000; and in addition, double the amount of damages which the United States may have sustained by reason of

doing or committing such acts, together with the costs of suit. This section further provides that such forfeiture and damages shall be sued for in the same suit.

Section 3491 of Revised Statutes gives jurisdiction to United States District Courts to hear and determine such suits; and provides that they may be brought and carried on by any person, as well for himself as for the United States.

■ An informer's action under Sections 3490–3494 of the Revised Statutes must rest on violations of Section 5438 as that section read at the time of the enactment of Section 3490. That seems to be conceded by both parties to this suit; and it has been so ruled by this court, and others. See Olson v. Mellon, D.C., 4 F. Supp. 947, affirmed, United States ex rel. Knight v. Mellon, 3 Cir., 71 F.2d 1021; United States ex rel. Kessler v. Mercur Corporation, D.C., 13 F.Supp. 742, affirmed, 2 Cir., 83 F.2d 178; United States ex rel. v. Salant & Salant, Inc., D.C., 41 F.Supp. 196, decision by District Judge Patterson, July 1, 1938.

Section 5438 of the Revised Statutes, as it stood when it was incorporated in Section 3490, R.S., reads as follows: "Every person who makes or causes to be made, or presents, or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States, or wilfully to conceal such money or other property, delivers, or causes to be delivered, to any

other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service, any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, every person so offending in any of the matters set forth in this section shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars."

The plaintiff contends the facts of this case bring it within the purview of these statutes. The defendants contend it does not.

The complaint charges, and the evidence in this case establishes, that the United States, in pursuance of the Emergency-Relief-and-Construction Acts of Congress, made certain grants of Federal funds to be expended in public-work projects undertaken by local municipalities and school districts in Allegheny County, Pennsylvania, under the supervision of the Federal Public Works Administrator, who is an official of the United States Government. See 40 U.S.C.A. Section 401(a). An application was made in each case to the Federal Government for a grant of Federal money to be used in the construction of these projects. Plans and specifications for each project were prepared by the local municipality or school district, submitted to the Public Works Administrator of the Federal Government for approval, and were approved by him. Bids were asked for, and received, for doing the electrical work thereon. Such bids were submitted to the Administrator for approval, and were approved by him. The money the Government agreed to contribute to these projects was paid out in the course of the carrying out of these projects

only on sworn estimates submitted by the contractor to the Administrator, and approved by him on Federal Form (I 23). The Federal funds allotted to each project were placed in a bank approved by the Administrator, which bank account contained also the funds of the local authority. This special fund was from time to time checked by a representative of the Administrator; and no payments could be made therefrom to the contractor doing the work, except with the approval of the Administrator, which approval was noted on Form I 23 above mentioned.

There was a conspiracy among the defendants, whereby they would agree among themselves as to which defendant was to submit the low bid for a particular project, and which of the other defendants would submit other and higher bids for the same project, thereby intending to control, and actually controlling the low bid to be submitted, and preventing any competitors bidding on any of the projects involved in this suit; thus compelling the Government to contribute and pay for doing the electrical work on the projects more than the Government would have been required to pay, had there been open and free competition in the open market for doing the electrical work.

In this connection it will be noted that the defendant-contractors, in submitting their bids which were approved by the PWA Administrator, submitted signed statements substantially as follows: "The undersigned hereby certifies that this Proposal is genuine and not sham or collusive, or made in the interest or in behalf of any person, firm or corporation not herein named, and that the undersigned has not, directly or indirectly, induced or solicited any other bidder to submit a sham bid, or any other person, firm or corporation to refrain from bidding, and that the undersigned has not in any manner sought by collusion to secure for himself an advantage over any other bidder." And further it will be noted that payments were made out of the joint construction account in banks approved by the Administrator and containing funds furnished by the United States and the local municipality or district on Forms I 23, of estimates furnished by contractor-defendants and approved by the Administrator. Therefore, in each transaction there was not an absolute gift of money to the local municipality or district; but a grant of money by the Government for payment to the contractor for a

portion of the work, which was disbursed only on vouchers submitted by the contractor to the Administrator, and approved by him.

In our opinion, the facts of the case bring it squarely within the provisions of Section 5438, Revised Statutes, which is applicable to "Every person who makes or causes to be made, or presents, or causes to be presented, for payment or approval, to or by any person in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department, or officer thereof, * * *." It requires no strained or forced construction of this Act to bring the facts of this case within the purview of Section 5438, Revised Statutes. A fair construction of this statute makes it apply to the facts of this case, because the claim on which the Government money was paid to defendant contractors was made directly to an officer of the Government; and, upon the allowance of this claim, the Government contribution to the PWA project was paid to them, out of the special construction account, in accordance with the terms and conditions under which these grants were made, i. e. PWA Form 230. This form provides in Part II, Paragraph 6, on page 5: "6. Disbursement of moneys in Construction Account.— Moneys in the Construction Account will be expended only for such purposes as shall have been previously specified in a signed certificate of purposes filed with and accepted by the Government. * * *"

It is our view that the Federal funds in these ·special construction accounts continued to be Federal funds until paid out to the contractors. This view finds support in Madden v. United States, 1 Cir., 80 F.2d 672, in which there was a grant of Federal funds by the Federal Emergency Relief Administration to the Emergency Finance Board, a Massachusetts State Agency, which transferred part of its funds to the City of Boston for payment of Boston Public Library employees. In that case, Judge Morris, delivering the opinion of the Circuit Court of Appeals, said on page 676 of 80 F.2d: " * * * Any diversion of such funds from the project to which they were assigned was a diversion of government money. As hereinbefore stated, all funds allotted by the federal government for the relief of unemployment even though disbursed by state agencies were earmarked as federal funds,

and if diverted from the use for which they were granted it constituted a fraud upon the government. Langer v. United States [8 Cir.] 76 F.2d 817. See, also, United States v. Walter, 263 U.S. 15, 44 S. Ct. 10, 68 L.Ed. 137; United States v. Clallam County (D.C.) 283 F. 645." In the case of Langer v. United States, 8 Cir., 76 F.2d 817, cited above, one of the questions involved was whether money loaned or granted to a state by the Reconstruction Finance Corporation, or by the Federal Emergency Relief Administration, ceased to be Federal funds. The contention was made in that case that the fund could be used in any manner the state saw fit. But the Circuit Court of Appeals held otherwise, saying on page 824 of 76 F.2d: "On the strength of these authorities, appellants contend that the money could be used in any manner they saw fit. In our view, the authorities do not sustain this contention. Congress can inquire into the ·manner of the execution of this duty by the state. An agreement in the nature of a conspiracy to defeat the application of the funds to their statutory purpose is within the rule of Haas v. Henkel, supra [216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112], and, as before observed, pecuniary loss is not essential. * * *"

Other Federal authorities support the view that the False Claims Statutes apply to frauds, even though there be an independent agency through which the money was handled.

In the case of United States v. Carlin, D.C.E.D.Pa., 259 F. 904, the court said, on page 907:

"The funds deposited by the United States Shipping Board Emergency Fleet Corporation under the construction contract for the payment, inter alia, of workmen's wages, were the funds of the United States which had been appropriated by Congress and authorized to be expended by the President through the agency determined by him. Through the authority delegated by him to the United States Shipping Board Emergency Fleet Corporation, under which it employed the American International Corporation as its agent, and under which the latter corporation employed the American International Shipbuilding Corporation as its agent, so much of the funds deposited as were used for payment of wages of workmen employed under the construction contract were a

part of the funds of the United States and were expended by the corporation carrying out the contract only as agent for the United States.

"Under the circumstances, a fraud, the effect of which was to fictitiously increase the total amount of the pay roll and therefore the contract actual cost of the shipyard at Hog Island or the vessels being constructed there, would by so much diminish the funds of the United States. * * *"

In Belvin v. United States, 4 Cir., 260 F. 455, the United States had a contract with Porter Brothers for the construction of buildings and other government work. The contract provided that the United States was to pay the full costs of the work done, and that Porter Brothers were to be paid a certain percentage of such costs. Porter Brothers employed Belvin as a fireman and Hoffman as a timekeeper. The rate of pay for the position of fireman was less than that for engineers. Belvin and Hoffman agreed that Belvin should be falsely and fraudulently carried on the pay rolls of the Porter Brothers as an engineer, which was done in accordance with the agreement. The defendants were indicted and convicted for conspiracy to defraud the United States. One of the arguments of counsel for the defendants was that the indictment set out a conspiracy to defraud the Porter Brothers, and not the United States. The court held that there was sufficient evidence to warrant the finding of a conspiracy to defraud the United States, Judge Pritchard saying, on page 457 of 260 F.:

"Any amounts paid out by Porter Bros. in excess of its 'net expenditures in the performance of said work,' in the absence of any knowledge on the part of the government, would have necessarily resulted in a loss to that extent to the United States. * * *

"The defendants sought by this conspiracy to do that which would necessarily result in defrauding the government. Porter Bros. could not in any view of the case lose a cent by virtue of this transaction. Their pay rolls were only used as a means by which the defendants could make a false charge, the burden of which would fall, not upon Porter Bros., but upon the government."

In United States v. Harding, 65 App.D. C. 161, 81 F.2d 563, the Texas irrigation district was incorporated for the purpose of constructing an irrigation project. The work was begun, but was discontinued for lack of funds, and the district applied to the United States, through the Public Works Administrator, for a loan and grant with which to complete the project, submitting plans and specifications which received the approval of the Administrator. The defendants then entered into a plan to secure a change in the method of completing the project by the substitution of a pipe system requiring the use of redwood material for an open canal system, and so to close the bidding for the contract for the construction of the project to all bidders except bidders on redwood. Some of the conspirators were to obtain control of the redwood lumber market so that no one else would be in a position to bid successfully on the project. The conspirators were to secure to themselves the exclusive right to bid for the work on the project, and thus to secure the making of the award to them; and were arbitrarily and corruptly to fix a bid for the project at a price which would allow the defendants a profit of 30% of the actual cost of its performance. One of the defendants, a representative of the administrator, was to use his influence by way of recommendations to his superior on the approval of the grant and loan to the district for the construction of the project under the plans and specifications substituted by the conspirators, as a result of which the conspirators would be awarded the contract; the provisions for competitive bidding would be rendered of no effect; and the government grant of money would be increased. The defendants were indicted for conspiracy to defraud the United States. The district court sustained the defendants' demurrers to the indictment. The Court of Appeals, in reversing the district court, said on pages 566 and 568 of 81 F.2d:

"* * * In this manner the conspirators were to defeat and nullify the provisions of the act of Congress with relation to grants and loans for irrigation projects and to cause the project to cost a very much larger sum—and thus to cause the United States to pay out sums of money under its agreement for the loan and for the grant which it would not otherwise have paid out. * * *

"* * * The ultimate object was the securing of the money of the United States. * * *

"This is particularly true here for reasons we have already stated; namely, that the conspiracy charged had, as its ultimate

object, the obtaining by the conspirators of funds of the United States which they could not receive and which the United States would not pay out except for the unlawful acts of its own employee in confederation with the other defendants. If the plan had been successful, and if the government had paid out moneys—as a grant or gratuity—in excess of those which it would have paid except for the dishonesty of its employee in confederation with the other defendants, it would hardly be contended the payment was lawful; and this would be equally true whether the President had the right to create the Public Works Administration or whether the appropriation by Congress of moneys to the particular purpose was or was not constitutional."

Then, in United States v. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205, the defendants were indicted for conspiracy to defraud the United States by furnishing false information and making false statements to the Secretary of Agriculture in order to secure benefit payments under the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq. The defendants sold hogs to the Government at premium prices through misrepresentation as to the identity of the producers of the hogs sold and the continued ownership by such producers, when in fact the hogs belonged to one or more of the defendants. The defendants demurred upon the ground that the provisions of the statute and the regulations of the Secretary of Agriculture were void, and that the acts alleged in the indictment did not constitute an offense against the laws of the United States. The court, in reversing the lower court, and remanding it for further proceedings, said, on page 217 of 302 U.S., on page 184 of 58 S.Ct.: "Such a construction is inadmissible. It might as well be said that one could embezzle moneys in the United States Treasury with impunity if it turns out that they were collected in the course of invalid transactions. See Madden v. United States [1 Cir.], 80 F.2d 672, 674. Appellees were not indicted for a conspiracy to violate the Agricultural Adjustment Act but for a conspiracy to violate the statute protecting the United States against frauds. It is cheating the Government at which the statute aims and Congress was entitled to protect the Government against those who would swindle it regardless of questions of constitutional authority as to the operations that the Government is conducting. Such questions cannot be raised by those who make false claims against the Government. See Langer v. United States [8 Cir.], 76 F.2d 817, 824, 825; Madden v. United States, supra; United States v. Harding, 65 App.D.C. 161; 81 F.2d 563, 568; United States v. MacDonald (D.C.), 10 F.Supp. 948."

In United States v. Mellon et al., 2 Cir., 96 F.2d 462, it was held that false statements in an application for a loan insured under the National Housing Act, 12 U.S.C.A. § 1701 et seq., were within the statute making it an offense to make false statements in any matter within the jurisdiction of any department of the United States, notwithstanding the application was made only to a bank and notwithstanding the bank might not have complied strictly with the rules of the Federal Housing Administrator regarding the insurance of loans. To the same effect, see Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607.

The defendants have quoted certain cases in support of their views that the funds involved in the instant suit were not Federal funds within the meaning of Section 5438, Revised Statutes. But we are of the opinion that they do not support the defendants' position.

For instance, in the case of United States ex rel. Meyer Salzman v. Salant & Salant, Inc., D.C.S.D.N.Y., 41 F.Supp. 196, Judge Patterson held that the False Claims Statute did not cover the funds that were given to the Red Cross. Judge Patterson said: "The Red Cross is not a part of the government, nor is it a department or officer of the government. It is an incorporated association created by Act of Congress, for the purposes mentioned in the act. In no sense are its funds the property of the government. In acting under the Joint Resolution of February 11, 1933, 47 Stat. 799, the Red Cross did not become part of the government or a department or officer of the government. Under the terms of the Joint Resolution, it merely received a donation from the government and administered it for the purpose specified." In this case it may be noted also that the Government retained no control over the disbursement of the fund given to the Red Cross, where in the case at bar the grant to the Public Works Administration was controlled all the way through by the PWA. Administrator.

Again, in the case of United States on the relation of Robert A. Gilchrist, etc., v. American Cotton Cooperative Association,

et al.,[1] in the United States District Court for the Southern District of New York, L 58—272, cited by the defendants, Judge Knox held that the plaintiff was not entitled to maintain suit, quoting an opinion by Judge Gibson in the case of Olson v. Mellon, D.C., 4 F.Supp. 947, in which Judge Gibson held that the False Claims Statute did not cover a false and fraudulent tax return. We cannot see that this has any bearing on the facts of the instant case.

Defendants further contend that they cannot be subject to penalties and double damages in the instant case, because they have already been punished for the same offense by fines in criminal proceedings in this court at No. 10462 Criminal. The indictment in the criminal case charged the defendants in the instant case with a conspiracy under section 37 of the Criminal Code, 18 U.S.C.A. § 88; it reads as follows:

"* * * throughout a period of time beginning on or about the first day of January, in the year of our Lord one thousand nine hundred and thirty-five and continuing each and every day thereafter until the return of this Indictment into this court, at Pittsburgh, in the County of Allegheny, in the Western District of Pennsylvania, and within the jurisdiction of this court, did knowingly, willfully, unlawfully, and feloniously conspire, combine, confederate, agree and have a tacit understanding together and with each other and with diverse other persons unknown to your Grand Jurors to defraud the United States, that is to say;

"9. That, while keeping up an appearance of competition and conveying to awarding authorities the idea and belief that said Defendant Electrical Contractors were rival bidders, the Defendants agreed that they would abate honest rivalry, avoid and prevent competition, deceive the awarding authorities, prevent transmission to awarding authorities of bids, and, in effect, secure in advance the awarding of contracts to one of the Defendant Electrical Contractors selected by them; and so defeat the plain intent and purposes of said Acts and Resolutions and defraud the United States, all to the mutual profit of the Defendants, the injury and damage of the United States, the selfish destruction of the public interest and the impairment of governmental functions and the discredit of public officials;"

To this indictment the defendants in the instant case pleaded "Nolo Contendere," and were fined by this court.

■ It will be noted that this indictment made no reference to the presentation of a false claim against the Government for payment or approval, such as would be required in charging an offense under Section 5438, Revised Statutes. We cannot find that the offense charged in the indictment is the same as charged in the complaint in this instant case; therefore, there is no double jeopardy here.

■ In addition, the case at bar is not a criminal action. It is a civil action under the provisions of Section 3490, Revised Statutes, to recover civil sanctions for the acts committed in violation of Section 5438, Revised Statutes, which is not barred by the criminal proceedings against defendants. See Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917. In this case, Mr. Justice Brandeis said, 303 U.S. at pages 399, 400, 58 S.Ct. at page 633:

"Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense. The question for decision is thus whether section 293(b) [26 U.S.C.A.Int.Rev.Code, § 293(b)] imposes a criminal sanction. That question is one of statutory construction. Compare Murphy v. United States, 272 U.S. 630, 632, 47 S.Ct. 218, 71 L.Ed. 446.

"Remedial sanctions may be of varying types. One which is characteristically free of the punitive criminal element is revocation of a privilege voluntarily granted. Forfeiture of goods or their value and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforcible by civil proceedings since the original revenue law of 1789. Act of July 31, 1789, c. 5, § 36, 1 Stat. 29, 47. In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions. Passavant v. United States, 148 U.S. 214, 13 S. Ct. 572, 37 L.Ed. 426; United States v. Zucker, 161 U.S. 475, 16 S.Ct. 641, 40 L. Ed. 777; Hepner v. United States, 213 U. S. 103, 29 S.Ct. 474, 53 L.Ed. 720, 27 L.R. A.,N.S., 739, 16 Ann.Cas. 960; Oceanic

---

. **1** No opinion for publication.

Steam Navigation Co. v. Stranahan, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013; Chicago, B. & Q. Ry. Co. v. United States, 220 U.S. 559, 578, 31 S.Ct. 612, 55 L.Ed. 582; United States v. Regan, 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494; Grant Bros. Construction Co. v. United States, 232 U. S. 647, 660, 34 S.Ct. 452, 58 L.Ed. 776; Murphy v. United States, 272 U.S. 630, 47 S.Ct. 218, 71 L.Ed. 446; Various Items v. United States, 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558; Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 334, 53 S.Ct. 167, 170, 77 L.Ed. 341."

We therefore conclude that the plea of double jeopardy is of no avail to the defendants.

Defendants further contend that this suit will not lie, because it has not been authorized by the Commissioner of Internal Revenue and the Attorney General, as provided for by Section 3214, Revised Statutes, 26 U.S.C.A.Int.Rev.Code, §§ 3740, 3745(d), which reads as follows: "Sec. 3214. No suit for the recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Commissioner of Internal Revenue authorizes or sanctions the proceedings: Provided, That in case of any suit for penalties or forfeitures brought upon information received from any person, other than a collector or deputy collector, the United States shall not be subject to any costs of suit."

■ In our opinion, that statute does not apply to the instant case. It relates to taxes, fines, and penalties relating to taxes. This suit is directly authorized by 3491, R.S., which provides, inter alia: "Suit may be brought and carried on by any person, as well for himself as for the United States; * * *." We therefore conclude that this objection to the instant suit was not well taken.

■ As to defendants' contention that Marcus is not an informer within the Act, because he furnished no information to the Government as to the facts upon which this suit is based before filing his suit, in our opinion that is not a necessary prerequisite to a suit under Section 3491, R.S., which expressly authorized "any person" to bring and carry on suit, with no requirement of previous notice to the United States. We therefore conclude this objection is without merit.

■ Defendants contend that there has been a misjoinder of parties-defendants, in that all the parties-defendants are charged to have participated in a joint conspiracy; and that there has been no sufficient proof to bind some of them. If that were so, the effect would be not to defeat the entire action, but would prevent recovery only against the defendants as to whom there was insufficient evidence.

■ The general rule is that in a civil action for conspiracy to defraud, the liability of the individual defendants, as well as the existence of the conspiracy, is for the jury. A verdict may be against those whom the evidence shows are guilty, and in favor of those who are innocent. See Barry v. Legler, 8 Cir., 39 F.2d 297, 303.

Counsel for defendants, C. W. Ridinger, Sr., President of Iron City Engineering Company, and Warren I. Bickford, its Secretary and Treasurer; and counsel for Robert Yates, Vice President of MacNeil Electric Company: contend there is not sufficient evidence in this case to permit a recovery against the defendants individually.

■ The rule to be applied to corporate officers in reference to their personal liability for wrongful acts of a corporation, is stated in 14A Corpus Juris 175, 176, as follows: "A director, officer, or agent of a corporation is liable in damages for injuries suffered by third persons because of his torts, regardless of whether he acted on his own account or on behalf of the corporation and regardless of whether or not the corporation is also liable. He cannot escape liability on the ground that in committing the tort he acted as a director, officer, or agent of the corporation, or on the ground that the corporation may also be liable. As in any case, it is of course necessary that the facts show the commission of a tort before the officer may be held liable therefor. An officer or director of a corporation is not liable for its torts where he has not participated therein, or had any knowledge of, or given any consent to, the act or transaction. Conversely, he is liable where he has participated or where he has had knowledge from first to last of the wrongful acts of the corporation. Likewise a director or officer is not, merely by virtue of his position, liable in all cases for the torts of other directors, officers, or agents; he is liable when, and only when, he participated in the tortious act, authorized or directed it, or acquiesced in it when he either knew, or by the exercise of rea-

sonable care should have known of it, and should have objected and taken steps to prevent it." See also, 19 C.J.S., Corporations, § 845.

█ It is a general rule of conspiracy that each conspirator is responsible for the acts of his associates committed in furtherance of the common design. And each is responsible for everything done by his confederates which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design.

The question presented is whether there is sufficient evidence to tie these particular defendants in the illegal bidding plan.

The responsibility of the particular defendants must be judged by the principles above stated, as applied to the evidence in this case with respect to the particular conspiracy here charged.

Taking the case of C. W. Ridinger, Sr., President, and Warren I. Bickford, Secretary and Treasurer of the Iron City Engineering Company, corporate defendant, there appears to be no contest over the fact that the corporation and C. W. Ridinger, Jr., its manager, participated in the collusive bidding of the Electrical Contractors Association. The question is: Was there sufficient evidence to show that Ridinger, Sr., and Bickford knew of, and participated therein to such an extent as to sustain a verdict against them individually?

Carmack, Secretary of the Electrical Contractors Association, testified as to the working of the collusive-bidding plan of the Association, and its members. He said that in most cases Ridinger, Jr., represented the Iron City Engineering Company in carrying out the bidding plan of the Association. He could not recall that the Senior Ridinger was ever present at a meeting of the Association. Carmack further testified that he had never discussed the bidding plan of the Association with the Senior Ridinger. Carmack's Test. pgs. 1152–1155. In this connection, there appears in Carmack's statement to the PWA Investigators (p. 58) which was read to the jury, the following:

"Q. Is the Iron City Engineering Company in that bracket? A. They are in that bracket, but they don't ever seem to be with us—they don't ever seem to be in that bracket. Don't know whether they attend the meetings or not." (See also Rec. pg. 2166)

It also appears by the evidence that the Senior Ridinger in person signed the bid of the Iron City Engineering Company on the municipal-airport project and the Northside Market project, which bids were submitted on the collusive-bidding plan of the Electrical Contractors Association. At the trial Ridinger, Sr., produced the estimate sheets of his Company on these two projects (Ex. 302, 303, Rec. pg. 827).

On the witness stand, Ridinger, Sr., when called upon to produce these papers, claimed his constitutional right against giving evidence against himself; but did produce the documents Exhibits 302 and 303, then saying (Rec. pg. 828): "I might say that I have not been active in this business for about twenty years, and I am not very familiar with these figures. I just had to take what was in the file."

In addition to that, it appears that Ridinger, Sr., signed, in behalf of the Iron City Engineering Company, checks for dues to the Electrical Contractors Association figured on the basis of volume of work done on the Association plan, as reported by the Company. There was introduced such a report of the Iron City Engineering Company signed by Ridinger, Jr. (Ex. 344A), dated January 28, 1938, which showed a volume of business at $18,466.15, and dues payable, $184.66 (Rec. 1131, 1132).

█ Is the evidence sufficient to sustain a verdict against Ridinger, Sr.? I am of the opinion that it is. The fact that under the Association's plan he signed bids on two projects, and checks for Association dues, certainly shows knowledge on his part of the dealings of his Company with the Association. It certainly could be properly inferred that he must have known, and approved, the dealings of his Company with the Association when he signed bids for these two projects and checks for Association dues. Counsel for defendant contends that Ridinger, Sr., signed the bids for these two projects at the request of his son, the manager of the Company. The evidence does not show that this is so. But, even if he did so sign at the request of his son, the inference might properly be made that his son advised him fully as to the relationship of the Iron City Engineering Company with the Electrical Contractors Association and

its bidding plan; that Ridinger, Sr., approved of it and his Company's participation therein.

It is contended, too, that Ridinger, Sr., was only the nominal head of the Iron City Engineering Company, devoting his entire time to the affairs of the Iron City Electric Company (now called the Westinghouse Electric Supply Company).

The testimony of Haines, an employee of this Company (Rec. pgs. 5343, 5344), shows that Ridinger, Sr., and Bickford managed its business. But there is no evidence which shows that Ridinger, Sr., was only the nominal head of the Iron City Engineering Company. In fact, there is no evidence to show how much of his time he devoted to either Company. Ridinger, Sr., might have taken the witness stand and disclosed his entire relationship with the two companies. He did not choose to do so. It would seem, therefore, that the evidence in the case would sustain the verdict of the jury.

█ As to defendant Bickford, he was secretary and treasurer of the Iron City Engineering Company. Carmack testified that Bickford was present at a hotel meeting of the Association (Rec. 1152). Carmack also testified that the electric-supply houses agreed to cooperate with the Association in its plans, and that he talked with Bickford, representing the Iron City Electric Company, about the cooperation of that Company (Rec. p. 2144). It may also be noted that Bickford, as secretary of the Iron City Engineering Company, signed the indemnity bond accompanying the bid of that company on the municipal-airport project. It would seem that Bickford's connection with the bidding conspiracy was for the jury, for they might properly infer therefrom that he personally knew of the plan, and participated in it, as far as his company was concerned.

Taking now the case of Robert B. Yates, vice president of the MacNeil Electric Company: His counsel contend that there was not sufficient evidence to involve him personally with the conspiracy.

Carmack testified that at the meetings Alvin S. MacNeil only represented the corporation, and that he could not recall that Yates ever came in on the bidding plan (Rec. 1158). However, the record shows that he signed proposals and contracts on projects involved in the plan. Yates himself took the witness stand and denied any personal knowledge or participation in the bidding plan of the Electrical Contractors Association (Rec. pages 2760, 2767, 2774, 2775).

As Yates signed proposals and contracts on projects awarded his company under the plan, it is our view that the testimony presented an issue to the jury of his participation in the conspiracy.

█ Counsel for the corporate defendants contend that corporations are not within the sanctions of Sec. 3490, Revised Statutes. This section applies to "Any person not in the military or naval forces." There is one case that supports this contention, i. e., United States v. Kansas Pacific Railway Co., 26 Fed.Cas. 680, No. 15,506. That case involved fraudulent claims against the United States, under Section 3490. Judge Foster held that the restrictions of the statute make it applicable to individuals only, and not to corporations. His reasoning is not sound that the statute refers only to persons capable of being employed in the land or naval forces, or in the militia; and that, as a corporation cannot be employed in such forces, it is not within the provisions of the statute. It seems to me the word "person", as used in this statute, includes corporations, because they are just as much within the mischief aimed at by the statute, as individuals. In fact, Congress has made it plain that the word "person" when used in the Revised Statutes, may be applied to corporations. Title 1, Chapter 1, Sec. 1, of the Revised Statutes, provides: "In determining the meaning of any Act or resolution of Congress, * * * the word 'person' may extend and be applied to partnerships and corporations, * * *." 1 U.S.C.A. § 1.

Our view in this respect is supported by United States v. Union Supply Co., 215 U.S. 50, 30 S.Ct. 15, 54 L.Ed. 87; Interstate Lumber Co. v. United States, 3 Cir., 101 F.2d 477.

The final ground urged by defendants why judgment should be entered in their favor is that there is not sufficient evidence on which to assess, or by which to measure, any damages. Section 3490, Revised Statutes, provides a penalty of $2,000, "and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing of such act."

■ We charged the jury as to the measure of damages, as follows: "The damage to which the plaintiffs would be entitled would be measured by the difference between the contract price paid the contractor therefor in excess of the amount which the United States would have been obliged to pay for the same work, had there been open, competitive and uncontrolled bidding." And again, in another part of the charge, we said: "Now, in computing the actual damage that was suffered on a particular project or particular instance, you would take the contract price for each of the PWA projects as to which testimony was introduced in this case, and then determine what you find to be a fair and reasonable low bid for doing the electrical work on that particular project, had there been fair and open competitive bidding. If that fair and reasonable low bid is lower in amount than the price for which the contract was awarded, the difference between the contract price and the fair and reasonable low bid would be the measure of actual damage suffered by the United States as to that particular project. Then the sum total of the actual damages would make up the total actual damages suffered by the United States. This amount you would then double to arrive at the damages which would have accrued to the United States by reason of the conspiracy to present false claims against the United States." We are of the opinion that we correctly stated the measure of damages to be applied by the jury.

■ The gist of this action is fraud and deceit. The Supreme Court, in McMullen v. Hoffman, 174 U.S. 639, 653, 19 S.Ct. 839, 844, 43 L.Ed. 1117, dealing with a collusive-bidding case involving a public work, characterized the nature of the case as follows: "But in this case there is more even than concealment. There is the active fraud in the putting in of these, in substance, fictitious bids, in their different names, but in truth forming no competitive bids, and put in for the purpose already stated. It is not too much to say that the most perfect good faith is called for on the part of bidders at these public lettings, so far as concerns their position relating to the bids put in by them or in their interest. The making of fictitious bids under the circumstances detailed herein is, in its essence, an illegal and most improper act. Indeed, it is a plain fraud, perpetrated in the effort to obtain the desired result." The damage to be recovered, therefore, would be the money which the Government contributed to each project in excess of what it would have paid, had there been fair and open competition.

This rule was found by the Court of Appeals of New York in People v. Stephens, 71 N.Y. 527, 559, to be applicable where there was fraudulent bidding.

However, the defendants say that even applying the measure of damage given by the court to the jury, the plaintiffs have proved no facts by which the actual damage suffered by the Government could be determined with reasonable accuracy. It is the contention of the defendants that, as the grant of the Government placed an absolute limit on the Government's share of the cost of the work—either 30% or 45%—of the original estimated cost of the project, it cannot be determined what loss, if any, the Government suffered by the fraudulent bidding, without first showing the total cost of the entire project; for, if that cost exceeded the original estimate, The Government would have paid only the agreed percentage of the original estimate, and may not then have suffered any loss by the fraudulent bidding plan of the Electrical Contractors Association.

■ We cannot follow this argument. Whatever the cost of the entire project may have been, the Government would be damaged so far as the electrical contracts are concerned, to the extent that it contributed to them in excess of what it would have been required to contribute, had there been open and fair competition. We see no merit in this contention of the defendants.

The motion of defendants for judgment non obstante veredicto will therefore be denied.

We will now take up and consider the defendants' motion for a new trial.

Their first proposition is that the defendants should have a new trial, because the verdict is inconsistent in exonerating the defendant Carmack, who, by his own testimony, is a confessed party to the conspiracy charged in the complaint.

The verdict, as tendered by the jury, reads as follows:

"And now, to wit March 22, 1941, we, the Jurors empaneled in the above-entitled case, find the defendants guilty as charged in the indictment and award damages

in the sum of Two Hundred three Thousand one thousand dollars and ninety one cents (203.100.91) plus the penalty of One hundred twelve thousand dollars Total $315100 91/100—The jury absolves Mr Robt C Carmack from damages in this suit

"Walter S. Colmery, Foreman"

On reading this form, the court found it to be in the form of a verdict in a criminal case, and suggested an amendment as to form to comply with the forms of verdict customary in civil cases. This form was then read to the jury; signed by the foreman; and upon a poll of the jury then taken, each juror stated that the verdict was his verdict.

This verdict reads as follows:

"Now, March 22, 1941, we the Jurors empaneled in the case above entitled, find a verdict in favor of plaintiff and against all the defendants except Robert C. Carmak, in the sum of $315,100.91, being $203,100.91 damages and $112,000 penalty, and as to defendant Robert C. Carmak, we find a verdict in his favor.

"Walter S. Colmery, Foreman."

This verdict the defendants say was inconsistent and cannot stand. We cannot see that the defendants against whom a verdict was rendered were injured by returning a verdict in favor of Carmack.

■ This is not a case where the defendants are liable jointly, if liable at all. It is a case where their liability is both joint and several. We cannot, therefore, see that the defendants against whom a verdict was rendered, are harmed by the verdict in this case. The plaintiffs could, of course, complain that the jury should have returned a verdict against Carmack; but his co-defendants could not.

Counsel for defendants themselves recognized that in their thirty-sixth point for charge, which reads as follows: "36. If the jury finds that any one or more of the defendants did not participate in any unlawful act, the jury should find in favor of such defendant or defendants, even though the verdict be against other defendants."

■ We did not affirm this point as drawn, but did say to the jury in our general charge as follows: "If you find that a conspiracy exists as charged, then you will have to determine which of the defendants were parties to that conspiracy. If you find that none of the defendants were involved in the conspiracy charged in this case, then you would return a verdict in favor of the defendants. If, on the other hand, you find that a conspiracy, as charged, exists in this case, you would return a verdict in favor of the plaintiffs and against the defendants involved therein for such amounts of damage and penalty as you would find from the evidence in this case that the plaintiffs would be entitled to, computed according to the measure of damage which I shall now give you."

■ The instruction we gave the jury is supported by the authorities. In 15 C.J.S., Conspiracy, § 18, page 1028, the rule is stated as follows: "Each conspirator is jointly and severally liable for all damage resulting from the conspiracy. * * *" And again, in 15 C.J.S., Conspiracy, § 31, subsec. c, it is said, page 1052: "Against one or more defendants. As a general rule, as the gravamen of the action is the damage and not the conspiracy, as stated supra § 21, a verdict or judgment may be rendered against any one or more of defendants, and in favor of the others, as the rule as laid down in Corpus Juris, which has been quoted and cited with approval, is that if plaintiff fails in the proof of a conspiracy or concerted design, he may still recover damages against one or more of defendants shown to be guilty of the tort without such agreement, and is not entitled to a verdict against defendants whom he does not prove participated in the wrong."

■ We, therefore, conclude that, in view of the fact that Carmack was a mere employee of the Electrical Contractors Association, a verdict in his favor would not bar a recovery against the other defendants who employed him to carry out the unlawful acts to the damage of plaintiff.

This view is supported by Strickfaden et al. v. Green Creek Highway District et al., 42 Idaho 738, 248 P. 456, 464, 49 A.L.R. 1057; Whitesell v. Joplin & P. Ry. Co. et al., 115 Kan. 53, 222 P. 133.

■ It is our view that the verdict, as first submitted by the jury, was defective and irregular in form; that all the court did was to mold the form of the verdict so as to award damages to the plaintiffs against all of the defendants (except Carmack), which was the evident finding of the jury, as stated in the verdict the jury first proposed.

■ It has been repeatedly held that the trial court has the power to mold the form of a verdict which has been returned in a defective form. See 64 C.J. 1094; Thomp-

son v. Emerald Oil Co., 279 Pa. 321, 123 A. 810; Shively v. McDonnell et al., 308 Pa. 298, 162 A. 287; Commonwealth v. John Mills et al., 3 Pa.Super. 161; Smullin, Appellant v. Harenski, 106 Pa.Super. 453, 162 A. 319.

We therefore conclude that no error was committed in molding the form of the verdict.

The next reason assigned by the defendants in their motion for a new trial is that the court erred in rejecting the defendants' offer to prove the actual cost to them of doing the work called for by the contracts on the PWA projects involved in this suit. We cannot see that the actual cost to the contractor of doing the work for which a contract was awarded to him can have any evidential bearing as to the amount of damages the plaintiffs would be entitled to recover. The question in this case is whether or not the Government paid more for its share of doing this work than it would have had to pay, had there been no fraudulent and collusive bids. If it did, then the Government would suffer damage to the extent that the bid put in on the collusive-bidding plan exceeded what would have been a fair and reasonable bid for the contract work in the open market, had there been no collusive-bidding plan. The plaintiffs offered evidence to show what would have been fair bids for doing the electrical work on the PWA projects involved in this case. The defendants offered evidence tending to show that the bids actually submitted were fair and reasonable. This presented an issue of fact for the jury, which found that the Government had been damaged, and the extent of such damage. The evidence fully sustains the verdict of the jury. The actual cost to defendants of doing the work can have no bearing on that issue. The cases cited by defendants in evidence as to cost of doing this work do not bear on the issues of this case; the facts are entirely different.

Defendants also contend this evidence should be admitted for the purpose of mitigating damages. We cannot conceive how defendants, as wrongdoers, would be entitled to the actual cost to them of doing the work, in order to mitigate the damages.

The next two reasons for a new trial refer to the exclusion of the testimony of Special Assistant to the Attorney General, M. Neil Andrews, and the records in the criminal cases against defendants. This matter has hereinbefore been discussed on defendants' motion for judgment n. o. v.; and we need add nothing to what we there said. They present no grounds for a new trial.

The next reason urged is that there can be but one penalty of $2,000 under the provisions of Sec. 3490, R.S. This section, as far as concerns this penalty, reads as follows: "Any person * * * who shall do or commit any of the acts prohibited by any of the provisions of Section 5438, Title 'Crimes', [section 80 of Title 18], shall forfeit and pay to the United States the sum of $2,000, * * *."

As we construe this statute, this penalty would be applicable to the false claims made on each project; and therefore, the plaintiffs could recover $2,000 for each such project. Counsel for plaintiffs contended each false affidavit or certificate that was submitted to the PWA administrator, created a liability for the $2,000.

There is support for that view in 15 C.J. S., Conspiracy, § 21, pages 1031 and 1032, where it is said: "The gist or gravamen of the action is not the conspiracy itself, but is the civil wrong, which is done under the conspiracy, and which results in damage to plaintiff, but it is not necessary that any particular conspirator should have profited thereby. Each tortious act resulting in damages creates an independent, separate cause of action against the conspirators, * * *." The defendants contend that as there was but one conspiracy charged, there could be but one penalty of $2,000.

We could not agree with either party on this issue, for the reason that it is our view that in each project there was a single, false, or fraudulent claim made arising from the collusive-bidding plan. On a review of the case, we are of the opinion that our ruling at the trial was correct.

The next proposition advanced by defendants is that each defendant is liable only for damages on the projects on which he bid. There is no merit in this contention. This is a conspiracy case, where the rule applies that each conspirator is liable for all the acts of his co-conspirators done in pursuance of the conspiracy.

The next point urged by defendants is that the court erred in not applying the rule as to burden of proof applicable to criminal cases. Counsel cite United States v. Shapleigh, 8 Cir., 54 F. 126, We cannot follow that case. This is a civil action to recover a penalty and damage. The rules

governing criminal prosecutions do not apply. Helvering v. Mitchell, 303 U.S. 391, 402, 58 S.Ct. 630, 82 L.Ed. 917.

Defendants also raise the question of double jeopardy in their motion for a new trial. We have already covered this matter in our opinion on defendants' motion for judgment n. o. v.

The next point made by the defendants is that the court should have affirmed, without qualification, their fifth point, which point and the answer of the court thereto read as follows:

"Defendants' Point No. 5: 'No inference against the defendants may be drawn from the fact that they refused to testify, because in so doing they were merely exercising a right which the United States Constitution gives them.'"

"That point is affirmed. But we say to you, in connection with that, it would have a bearing upon whether or not there was any evidence that would refute the testimony of Carmack, for instance, when no witnesses have taken the stand to deny this testimony; that would be a fact for your consideration."

Upon objection by counsel for both plaintiffs and defendants to this answer to Point 5, we then said to the jury:

"Members of the jury, I have heard counsel with reference to their exceptions to my charge, and I have decided to affirm without qualification the defendants' fifth point, which reads as follows:

"'No inference against the defendants may be drawn from the fact that they refused to testify, because in so doing they are merely exercising a right which the United States Constitution gives them.'"

■ Objection is made that this does not cure the alleged error of the court in not unqualifiedly affirming the fifth point. We cannot see that this is so, for a judge may certainly correct errors in his charge. In 64 C.J. 734, it is said "* * * A judge can modify or correct instructions at his own motion, and recall the jury for such purpose, or to amplify his charge, or to give additional instructions on material issues not covered by the original charge; and he may revoke an instruction when he becomes convinced of an error in a previous ruling. Such modification or correction may also be made on motion of counsel. It is not error for the court, on request, to give a charge explanatory of oral or written charges, and such a charge may be given to correct previous instructions, or to remedy a misleading charge, or to explain the application of a principal law stated in a previous instruction. * * *"

■ And again, on page 1007 of the same volume, it is said: "* * * An error in a charge is, as a general rule, cured where the court subsequently withdraws or corrects it, even though the jury are not told that the first instruction was incorrect. * * *"

We therefore conclude there was no error as to our instructions to the jury on Point 5.

The next reason advanced for a new trial is that the court should have affirmed defendants' 7th point, which reads as follows: "7. If the maximum limit of the Federal Government's agreed contribution on any project would have been reached without the alleged excessive amount of the electrical contract, there can be no recovery of any damages on account of such projects in this case."

■ We have already discussed this matter in consideration of defendants' motion for judgment n. o. v. For the reasons there stated, we are of the opinion that there was no error in the refusal of that point; and that the defendants are not therefore entitled to a new trial by reason of the refusal of that point.

■ We next consider the refusal of the defendants' 8th point, which reads as follows: "8. There can be no recovery of any damages because of any payments made upon periodic estimates for partial and final payment, known as L-23 forms, which were submitted by contractors after February 5, 1940." We see no error in the refusal of this point. Certainly the United States is not to be estopped in matters affecting the powers of government. The PWA administration is a governmental function for the relief of the destitute and the creation and increase of employment; hence, estoppel in this will not apply to the United States.

In 19 Am.Jur., Estoppel, page 822, it is said: "The United States is not subject to an estoppel which impedes the exercise of the powers of government. It is not estopped to deny the validity of a transaction or agreement which the law does not sanction, nor does an estoppel arise through an act or representation made by an officer or agent without authority to act for the government in the premises." The cases

218

cited by defendants do not apply to governmental functions.

The next reason urged by defendants for a new trial is that the court erred in refusal of defendants' 9th point, which reads as follows: "9. There can be no recovery of any penalty or forfeiture on account of any project in which no actual damages have been shown." Section 3490, R.S., expressly provides for a penalty of $2,000, "and, in addition, double the amount of damages which the United States may have sustained." This makes it plain that regardless of damages sustained, the United States would still be entitled to recover the penalty. This point refers to instances where the United States withheld payments on account of the discovery of the fraud, so that no actual damage was shown. However, that would not preclude the United States from recovery of the penalty prescribed by Section 3490, R.S.

The cases cited by defendants are not in point, for none of them involved an action by the United States to recover penalties under Sec. 3490, R.S. We conclude that our refusal of this point was correct.

The next assignment of error relates to our refusal of defendants' 10th point, which reads as follows: "10. Where the United States Government has since February 5, 1940, paid any sponsor an amount in excess of the amount of the percentage of alleged damages to which the Government would be entitled, there can be no recovery on that particular project."

This point is similar to point 8 which we have hereinbefore discussed. We need add nothing to that discussion. There is no merit in this point.

The defendants' reasons for a new trial, numbers 15 to 34 inclusive, refer to the refusal of defendants' points for charge, 11 to 26 and 32 to 35 inclusive, asking binding instructions from the court with reference to damages on the several projects enumerated in those points. The issue of fact as to whether any damage was suffered by the United States on these several projects involved in this case was for the jury, as we believe we have heretofore demonstrated in this opinion. The defendants, in their briefs on motion for a new trial, do not discuss these projects separately, except as to the Woodville County Home project. Their contention in regard to that project is that it was not covered by either of the bidding plans alleged in the complaint.

With this contention we cannot agree. There was ample evidence that there was concerted action to prevent competitive bidding on this project. Collusive bids were submitted by members of the Electrical Contractors Association, to-wit: Hess & Barton, Inc.; Fort Pitt Electric Company; Lord Electric Company; Raphael Electric Company; Franklin Electric & Construction Company; Morganstern Electric Company, Inc. The Hale Electric Company, Iron City Engineering Company, Craig Electric Company, and Sargent Engineering Company took out plans on this job, but did not bid. Other contractors were bribed into not bidding on this project. From the evidence the jury could find that this project fell within the first bidding plan in operation around the years 1935 and 1936, in which members in the higher bidding brackets agreed as to who would get the job. The fact that Hess, of Hess & Barton, Inc., may have bribed other contractors not to bid, would not take this particular project out of the conspiracy.

The rule to be applied is stated in 11 Am.Jur. p. 549, as follows: "The rule of responsibility for the acts of co-conspirators includes acts done before the defendant joined the conspiracy, as well as the acts subsequent to his participation. Whether or not the act done was in furtherance of the common design or whether it was a natural and probable consequence flowing from the execution of the common design is always a question for the jury." And again on page 580 of the same volume, it is said: "The connection between the parties having been established, whatever was done in pursuance of the conspiracy by one of the conspirators is considered as the act of all the conspirators; all are equally liable therefor as joint tort-feasors, regardless of whether they were original parties to the conspiracy and irrespective of either the fact that they did not actively participate therein or the extent to which they benefited thereby. * * * Every person entering into a conspiracy already formed is deemed in law a party to all acts committed by any of the other parties either before or after his entrance, in furtherance of the common design."

The next reason urged is that the court erred in not affirming the defendants' 36th point for charge, which reads as fol-

lows: "36. If the jury finds that any one or more of the defendants did not participate in any unlawful act, the jury should find in favor of such defendant or defendants, even though the verdict be against other defendants." We did, however, cover the matter in our general charge as follows: "If you find that a conspiracy exists as charged, then you will have to determine which of the defendants were parties to that conspiracy. If you find that none of the defendants were involved in the conspiracy charged in this case, then you would return a verdict in favor of the defendants. If, on the other hand, you find that a conspiracy, as charged, exists in this case, you would return a verdict in favor of the plaintiffs and against the defendants involved therein for such amounts of damage and penalty as you would find from the evidence in this case that the plaintiffs would be entitled to, computed according to the measure of damage which I shall now give you."

That fully covers the matter referred to in this point, and we are not required to use the exact language suggested by a point. There is no merit in this suggested reason for a new trial.

The next matter raised by defendants is that defendant Carter, because he held a commission as a reserve officer in the military service of the United States, cannot be held liable for a violation of Section 3490, R.S. We cannot agree with this contention. This section applies to "Any person not in the military or naval forces of the United States, or in the militia, called into or actually employed in the service of the United States, * * *." As a reserve officer, Colonel Carter maintained his civilian status, and would not be a person in the military force of the United States, unless and until called into active duty. There was no evidence he was on active duty at the time of the commission of the acts complained of in this case. We therefore hold that he was within the terms of this statute.

The defendants next complain that the court erred in admitting in evidence the statement of claim in a suit filed in the Court of Common Pleas of Allegheny County, Pennsylvania, against defendants. This statement was offered for the purpose of showing certain admissions made by some of the defendants upon being served with a copy of the statement of claim in that suit, and for the purpose of showing that the suit was discussed in conference with some of the defendants. We are of the opinion that for the purpose it was offered, this statement was admissible. It must be noted that a conspiracy was charged in this case, and that considerable latitude is permitted. See 15 C.J.S., Conspiracy, § 29, pages 1043, 1044, where it is stated:

"* * * The fact of the conspiracy may, of course, be shown by direct evidence, and should be so proved if this character of evidence is available; but since direct evidence is ordinarily in the possession and control of the alleged conspirators and seldom can be obtained, a conspiracy usually is susceptible of no other proof than that of circumstantial evidence, and therefore it is a well-settled rule that proof by direct and positive evidence is not necessary, and that circumstantial evidence, that is, evidence of the acts, of the alleged conspirators and of the circumstances surrounding the transaction which is the basis of the charge, is admissible to prove the conspiracy charged; * * *.

"The law permits great latitude in the admission of circumstantial evidence tending to establish a conspiracy, and to connect those advising, encouraging, aiding, abetting, and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy, as the jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue and which will enable them to come to a satisfactory conclusion. * * *

"The limits to which evidence of this kind may be admitted rest in the sound discretion of the trial court, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact."

The next charge is that the court erred in admitting in evidence the estimates of the witness Proctor. These were the estimates that Proctor made as to what would have been fair and reasonable bids for the electrical work for each of the projects. These Proctor estimates were identified as his compilation of what would have been a fair low bid for doing the work on these projects. He testified orally as to this compilation, but the papers themselves were not examined by the jury, with the exception of one estimate which was shown to the jury by counsel for defend-

ants. At the conclusion of the charge, there was a discussion as to whether these estimates should go to the jury. We ruled they should not. (See Rec. pp. 5528–5532.)

The next reason urged by defendants is that the court erred in not withdrawing a juror and continuing the case, because of remarks of counsel with reference to the plea of nolo contendere entered by defendants in the criminal proceedings, and offering no defense therein.

■ However, counsel for defendants in their opening to the jury mentioned the fact that the defendants pleaded nolo contendere to the criminal charges. Likewise, counsel for defense, in final argument to the jury, urged that no admission of liability was to be implied from the fact that defendants had pleaded nolo contendere in the criminal proceedings.

In disposing of the motion to withdraw a juror and continue the case, we said to the jury (Rec. p. 5488): "The Court: We decline the motion to withdraw a juror. Counsel may proceed with his argument. The fact that there was a plea of nolo contendere having been mentioned by counsel for the defendants in the course of their argument, counsel I think may discuss that subject. Possibly he went a little further than he should have gone in the discussion of it, because, as I look at it, there is no inference of liability in this case to be drawn from the mere fact that they entered a plea of nolo contendere in the case that was brought against them in the criminal court. This case has to be decided by the jury upon the evidence that is offered before them in this case. My own view is that the matter ought not to have been adverted to by counsel on either side in the course of their arguments." This I believe was a proper disposition of this motion.

■■ The next reason urged by defendants for a new trial, is that the court erred in refusing to strike out testimony of Proctor as to what would have been à fair low bid for certain of the projects involved in this suit, because it was based on hearsay. There is no merit in this proposition. Proctor testified to his own estimate, as to what would have been a fair low competitive bid for these projects. The fact that Proctor employed Lesterick to assist him in securing price-lists of materials, would not make his testimony hearsay. Proctor certainly could employ a man to assist in preparing his compilation of prices quoted by manufacturers on ma-

terials required to do this electrical work. The final result, as given in court, was Proctor's own estimate as to what would have been a fair low bid. The weight to be given that testimony was, of course, for the jury.

Assignments of error, Nos. 41 to 47 inclusive, relate to exceptions taken by defendants to portions of our charge to the jury. Counsel, in their brief, submit no specific argument as to them. As they relate largely to matters that we have elsewhere discussed in this opinion, we do not deem it necessary to discuss again the legal questions involved therein, and merely hold they are without merit.

■ The next assignment of error relates to defendants' offer to prove their reputations for honesty, fair dealing, and integrity. As we have already held this to be a civil action to recover a civil sanction, this evidence is not competent.

As to assignments of error: No. 49, relating to the comment of the court as to defendants not testifying; No. 50, relating to reformation of the verdict; No. 51, relating to the amount of the verdict; and No. 52, relating to the admission of evidence regarding the County Home at Woodville—these matters have all been discussed elsewhere in this opinion. These assignments of error are without merit.

In assignments of error Nos. 53 and 54, defendants raise the question of whether counsel for defendants were improperly limited in their cross-examination of plaintiffs' witness Proctor, the expert called to testify concerning what would have been a fair low bid in the open market for the projects involved in this case. The record will show that counsel for defense devoted a great deal of time to the cross-examination of this witness, covering thoroughly every phase of this witness' testimony in chief. Surely, the time of the court and jury should not be taken up in having this witness refigure these projects in open court.

When this subject was up at the trial, the court then said (Rec. 3298, 3299):

"The Court: It is just a question, gentlemen, whether we will take the time to have this witness make this refiguration on the witness stand or whether he may come in with his breakdown and be cross examined about it later. It does not seem to me advisable to spend court time by having him figure here on the witness stand·

these items which he says he cannot give now, he will have to take some time to refigure it."

"Mr. Eckert: Will Your Honor note us an exception to that ruling?"

We cannot see that the defendants could be harmed by this ruling. If that course had been followed, the defendants then would have had full opportunity to cross-examine the witness Proctor on the figures submitted. This trial lasted from December 2, 1940, to March 22, 1941. It certainly was asking too much for the court and jury to sit idly by while this witness made his computations over again.

The question came up again at the trial (Rec. pp. 3578–3580), when the witness was asked to recompute from the plans of one of the projects the amount of wire required. The witness said it would take about sixteen hours to make the necessary measurements on the plans (Rec. p. 3578). Certainly the court and jury should not be required to sit and watch the witness do this figuring on the witness stand. We cannot see anything in our ruling on these two matters that is inconsistent with substantial justice to both parties. Therefore, even if there be error in our action as to these two matters, no harm has been done. See Rule 61 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

On the whole case, therefore, we conclude that the motions for judgment n. o. v., or in lieu thereof, for a new trial, are without merit, and should be denied.

Orders may be submitted accordingly.